Charles N. BUCHHOLTZ and Lester J. Tauer, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

SWIFT & COMPANY and Amalgamated Meat Cutters and Butcher Workmen of North America, Defendants.

No. 4–71–Civ. 602.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 2, 1973.

Reed K. McKenzie, Hvass, Weisman & King, Minneapolis, Minn., for plaintiffs.

Vance B. Grannis, Sr. and Vance B. Grannis, Jr., Grannis & Grannis, South St. Paul, Minn., for defendant Swift & Co.

Donald C. Savelkoul, Sigal & Savelkoul, Minneapolis, Minn., and John M. Bowlus, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for Meat Cutters Union.

## MEMORANDUM

LARSON, District Judge.

This action arises out of the termination by defendant Swift & Company

(hereinafter Swift) of the bulk of its operations at its South St. Paul meat packing plant in late 1969. Plaintiffs Charles N. Buchholtz and Lester J. Tauer, former Swift employees and members of the local labor union (P–167) at the South St. Paul plant, instituted this suit on behalf of themselves and all others similarly situated against Swift and the International Union, Amalgamated Meat Cutters and Butcher Workmen of North America (hereinafter Amalgamated).

Swift is being sued under § 301 of the Labor Management Relations Act of 1947, as amended (29 U.S.C. § 185(a)) for unpaid vacation compensation allegedly earned during the year 1969 under the terms of the master collective bargaining agreement then in force between Swift and Amalgamated's predecessor, the United Packing House, Food and Allied Workers, AFL–CIO. Damages also are being sought against Amalgamated under §§ 7, 8(b), and 9(a) of the National Labor Relations Act, as amended (29 U.S.C. §§ 157, 158(b) and 159(a)) upon a claim that it violated its duty of fair representation by withdrawing a vacation pay grievance on behalf of the members of the asserted class in exchange for a settlement agreement entered into with Swift regarding pension rights for a relatively small number of senior Swift employees.

On May 29, 1969, pursuant to the 26-week notice requirement under § 77 of the master agreement, Swift announced to its workers that it planned to cease operations at the South St. Paul plant as of November 29, 1969. Swift effectuated this plan on the stipulated date by terminating most of its activities at the plant although a small force of about 200 persons remained at work there. Most of the employees, between 850 and 1,500, were either terminated or transferred to other Swift plants before or at the closure date or by December 27, 1969, at the latest. Since union membership terminated upon the ending of

employment, the local union thereafter consisted of the approximately 200 employees remaining at the plant.

Following the May 29 announcement of the impending shutdown, the local union made four demands upon Swift. One of these was that the company pay the departing employees vacation pay earned by them during 1969. Swift refused to pay, maintaining that the employees were ineligible pursuant to the terms of the collective bargaining agreement. The pertinent terms of the master agreement then in force were as follows:

## "VACATIONS

30. *Vacation Year*—Vacation eligibility requirements are based upon credited service. The period December 28 through the subsequent December 27 shall be considered the vacation year.

31. *First Vacation*—An employe [sic] becomes eligible for a vacation for the first time when the employment records show that either of the following requirements has been met:

(a) The completion of 365 calendar days of credited service without having been off the payroll for more consecutive days than sixty, Sundays and holidays included, while accumulating this credit for service.

## OR

(b) As soon as the employment records show any consecutive 365-day period during which he has completed 270 calendar days on the payroll. (This requirement is not fulfilled unless at least one year has elapsed from the date of the employe's [sic] original employment.)

32. *Subsequent Vacations*—An employe [sic] who has received his (or her) first vacation (excluding an employee scheduled to be retired on Jan-

uary 1) is hereafter eligible for subsequent annual vacations as follows:

(1) On December 28, provided that on said December 28 he is being carried on the active payroll and provided that he has at all times since his last vacation been on either the active payroll or a benefit payroll;

OR

(2) On December 28, provided that during the preceding 365 calendar days he has not been off the payroll for more consecutive days than sixty (60), Sundays and holidays included, and provided that on said December 28 he is being carried on the active payroll;

OR

(3) On December 28, provided that during the preceding 365 calendar days he has completed 270 calendar days on the payroll and provided that on said December 28 he is being carried on the active payroll;

OR

(4) On that date in the vacation year, following the vacation year in which the employe [sic] received his last vacation, by which the employe [sic] has either:

(a) Completed 365 calendar days of credited service without having been off the payroll for more consecutive days than sixty (60), Sundays and holidays included, while accumulating this credit for service, and provided he is on that date being carried on the active payroll;

OR

(b) During the preceding 365 days completed 270 calendar days on the payroll, and provided he is on that date being carried on the active payroll."

Since the vacation eligibility period runs from December 28 to December 27 of the following year, it appears that,

literally interpreted, the master agreement requires that to be eligible to earn a vacation for 1969, an employee must be in Swift's employ as of December 28, 1969. He also must satisfy one of the alternatives listed in § 31 or § 32 for initial and subsequent vacations, respectively. But compliance with these requirements was made impossible, for the bulk of the South St. Paul employees, by virtue of Swift's termination of most of its operations there prior to that date.

Another provision of the agreement, § 33, grants one-week annual vacations for the first year in which an employee is eligible for a vacation, two weeks per year beginning with the third vacation for which eligibility is established, three weeks per year beginning with the tenth vacation for which an employee becomes eligible, and four weeks annually commencing with the twentieth vacation eligibility, scaled down to fifteen years eligibility as of December 28, 1967. Vacation pay, under § 35(a), is to be computed on the basis of 2.2 per cent of the employee's gross earnings (excluding suggestion awards) for the previous calendar year for each week of the vacation that has been earned.

Section 58 of the agreement sets up a five step grievance procedure, and § 59 provides that a settlement of a grievance reached at any stage of the prescribed procedure "shall be final and binding on all parties concerned."

Following Swift's refusal to make the vacation payments, the local union filed four grievances that were processed through the fourth step of the five step grievance scheme set up by the master agreement. One of these grievances pertained to vacation pay. On June 30, 1971, prior to reaching the final step, that of arbitration, a settlement was reached between the local union, Amalgamated, and Swift. This agreement provided for the withdrawal of the four grievances, including the vacation pay demand, in exchange for certain pension rights and other benefits for apparently

67 designated Swift employees with thirty or more years of credited service at the time of the closure who were not otherwise eligible for immediate pensions because of insufficient age. Pursuant to § 59 of the master agreement. Swift and Amalgamated consider the settlement to be binding.

Plaintiffs filed this suit on November 26, 1971, charging that Amalgamated breached its duty of fair representation in entering the agreement and that Swift breached the above vacation pay clauses of the master agreement by refusing to pay the claims. In the nearly two years that have passed since commencement of this action, Swift and Amalgamated have deposed the two named plaintiffs; the named plaintiffs in turn have deposed five former officials of the local union, and some of defendants' documents have been produced or identified during the discovery process. The plaintiffs still intend to depose about six officials of Swift and of Amalgamated and to inspect more of defendants' records.

Plaintiffs have now moved under Rule 23(c)(1) of the Federal Rules of Civil Procedure for an Order declaring that this suit may be maintained as a class action and for designation of the class. Defendants oppose the motion on the ground that it is premature. They demand a preliminary hearing regarding the likelihood of plaintiffs' prevailing on the merits, or a hearing on motions they intend to make for summary judgment, prior to the Court's ruling on plaintiffs' Rule 23(c)(1) motion. Should their demand be denied, defendants request in the alternative that the class action be dismissed or that the class be limited in scope from that sought by plaintiffs.

The issues thus before the Court are as follows: 1) Should plaintiffs' motion for determination of maintainability and designation of a class be deferred pending a preliminary, or summary judgment, hearing on their likelihood of prevailing on the merits? 2) If not, may this suit be maintained as a class action? 3) If so, how should the class be defined?

For the reasons hereinafter discussed, the Court rejects defendants' proposed procedural timetable. Rather, it feels that the time is now ripe for determination of the maintainability of this as a class action. Furthermore, treating the issues under Rule 23, the Court grants plaintiffs' motion as to the maintainability of the class action and defines a class to be comprised of all of Swift's South St. Paul employees during 1969 who were terminated between May 29, 1969–December 27, 1969. This Order, however, is conditioned upon plaintiffs providing the Court within 30 days with a complete listing of the names and mailing addresses of all members of the class.

I. *Postponement of Determination under Rule 23(c)(1)—*

Defendants' request to postpone ruling on the determination of maintainability as a class action under Rule 23(c)(1) is not without merit in the abstract. If a preliminary hearing demonstrates the inordinate unlikelihood of plaintiffs prevailing on the merits in this action, class action treatment might be denied. If so, the expenses and time consuming efforts of giving to class members the required notice under Rule 23(c)(2) can be averted. Other management problems attendant in a class action also may thus be avoided. *See* Philadelphia Electric Company v. Anaconda American Brass Company, 42 F.R.D. 324, 328 (E.D.Pa.1967). There would be comparable effects if the Court next proceeds to pass upon and rule in favor of defendants' summary judgment motions. But the particular circumstances of this case militate against following either of these procedures here.

■ Rule 23(c)(1) provides for class determination to be made "[a]s soon as practicable." The rationales underlying the notice requirement of 23(c)(2) pro-

vide important stimuli for an early determination. "[I]f notice is to be effective—if class members are to have a meaningful opportunity to request exclusion, appear in the action, object to the representation, etc.—the invitation must go out as promptly as the circumstances will permit." Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39, 41 (1968).

Besides considerations pertaining to notice, the running of the statute of limitations is another factor that favors Rule 23(c)(1) determination with dispatch. Since a finding against maintainability ordinarily will not toll the statute, 7A Wright & Miller, Federal Practice and Procedure § 1795, p. 222 (1972), if determination is postponed, potential class members who are aware of the pendency of the action may be lulled into inaction or otherwise refrain from protecting their own rights. If class treatment then is denied, they could find themselves barred by the statute should they subsequently seek to bring individual suits on the same underlying claims as predicated the purported class action. Manual for Complex Litigation § 1.40, pp. 18–19 (1973); See also Frankel, Some Preliminary Observations Concerning Civil Rule 23, supra, 42.[1] Even if not barred, pretrial duplication could result since the individuals later bringing suit but who were not initially named plaintiffs may have to conduct their own repetitive discovery. See Manual for Complex Litigation, supra, § 1.40, p. 19.

Despite these considerations, there are many circumstances that justify postponement of Rule 23(c)(1) determination. Normally, this is because of inability to prudently determine the appropriateness of class treatment or because of the pendency of other proceedings on the same subject matter. E. g., City of Inglewood v. City of Los Angeles, 451 F.2d 948 (9th Cir. 1971) (Determination under Rule 23(c)(1) postponed until jurisdiction resolved); Moldenhauer v. Provo, 326 F.Supp. 480 (D. Minn.1970) (Determination deferred pending appointment of three-judge court pursuant to 28 U.S.C. §§ 2281, 2284); Baxter v. Savannah Sugar Refining Corp., 46 F.R.D. 56 (S.D.Ga.1969) (Determination partially deferred in order to allow discovery to proceed to develop factual background of the controversy); Adderly v. Wainwright, 272 F. Supp. 530 (M.D.Fla.1967) (Determination deferred until special inquiry conducted regarding status of legal proceedings pertaining to and legal representation of purported class members).

■ These cases demonstrate that what is the most opportune time for determination of class maintainability necessarily will vary with the circumstances. 7A Wright & Miller, supra, § 1785, pp. 129–130. In short, "[a]s soon as practicable" is not a command that determination under Rule 23(c)(1) must take precedence over other procedural devices. Rather, it is a very plastic term, characteristic of Rule 23 in general, whereby courts are "to weigh the

---

1. Although the question is unresolved, it has been suggested that tolling may be appropriate for absent members of a disbanded class as a condition of striking the class action. 7A Wright & Miller, supra, § 1795, p. 222; Frankel, Some Preliminary Observations Concerning Civil Rule 23, supra, 42. It has been observed that the equities often will favor tolling for the members of the putative class who were not named plaintiffs since it is difficult for defendants to be heard to say that they relied on the passage of time regarding these absentees. State of Minnesota

v. United States Steel Corporation, 44 F.R. D. 559, 575–576 (D.Minn.1968).

In any event, the statute of limitations problems do not appear to pose severe obstacles in this case. For reasons discussed infra, the Court is inclined to apply the six year Minnesota statute of limitations for contract actions. M.S.A. § 541.05(1). Consequently, should the class action be denied and the limitations period not be tolled, subsequently brought individual actions would not be barred until sometime in 1975.

particular circumstances of particular cases and decide concretely what will work, and how to work, in the individual situations as they appear." Frankel, Some Preliminary Observations Concerning Civil Rule 23, *supra,* 40.

Defendants' request to postpone determination under Rule 23(c)(1) relies principally upon Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968), and cases that have adopted its reasoning. *Dolgow* involved a class action suit under the Federal securities laws brought by four purchasers of Monsanto Company stock, suing on behalf of more than 200,000 similarly situated investors, alleging misleading manipulation of stock prices on the part of certain corporate officers and directors. The case was before the Court on a motion under Rule 23(c)(1) by plaintiffs.

Cognizant of the numerous "serious consequences" attendant upon determination that a class action is maintainable, Philadelphia Electric Company v. Anaconda American Brass Company, *supra,* 328, the Court decided to interpose a preliminary hearing at which plaintiffs would be required to show a "substantial possibility that they will prevail on the merits." 43 F.R.D. at 501. Although this procedural device was not expressly authorized by Rule 23, the Court felt that such a preliminary "merits" hearing was sanctioned by Rules 23(d) and 43(e), by analogy to a hearing on a motion for a preliminary injunction, and by analogy to postponement of notice until discovery is conducted, *e. g.,* Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 738 (N.D.Cal. 1967). 43 F.R.D. at 501–502.

*Dolgow* viewed the preliminary hearing as a form of " 'controlled discovery,' based primarily on documentary evidence." 43 F.R.D. at 502. If emulated here, the Court would structure a two-stage hearing at which defendants initially would be called upon to demonstrate the insubstantiality of plaintiffs' claims as to the breach of the duty of fair representation or to eligibility for vacation pay under the terms of the master agreement. If they were unable to do so, the Court would proceed to determination of maintainability as a class action under Rule 23(c)(1). If defendants were able to do so, the second stage would be reached at which plaintiffs would have to rebut their showing. If plaintiffs were to do so, again the Court would proceed to ruling on class maintainability. If not, the class action element of the case would be dropped.

Pursuant to this ruling in *Dolgow,* a hearing was held, after which Judge Weinstein requested defendants to move for summary judgment. This they did, and he ruled in their favor, concomitantly disallowing the class action, in an unwritten opinion.

The Second Circuit, however, considered this action improper and reversed. Dolgow v. Anderson, 438 F.2d 825, 833 (1971) (on petition for rehearing). The case was remanded to Judge Weinstein with a directive to write an opinion, as he initially had intended, of his findings and conclusions. *Id.,* 829, n. 5; 833. In remanding, the Second Circuit indicated that the trial court should reconsider its decision on the class action question, apparently believing that the denial of class action treatment was linked to the granting of summary judgment.

On remand, Judge Weinstein adhered to his original position on the class action issue, pointing out that the test for class maintainability under Rule 23 is more exacting than the test for withstanding summary judgment under Rule 56 and that his decision for summary judgment *a fortiori* meant that Rule 23 was not satisfied. Dolgow v. Anderson, 53 F.R.D. 664, 667 (E.D.N.Y.1971). Despite the Circuit Court's reversal of summary judgment, Judge Weinstein found plaintiffs' likelihood of prevailing on the merits "so slight," 53 F.R.D. at 668, that defendants should not be put to the expense and other burdens of a

class action on such an apparently unmeritorious case.

Consequently class action treatment was denied, grounded, in part, on the absence of a "substantial possibility" of plaintiffs prevailing on the merits. In so doing, the Court elaborated further upon its reasoning. The critical factors central to the denial of class action treatment in *Dolgow* were the following: The publicity attendant the mere ordering of the case to proceed as a class action would have seriously deleterious stock market repercussions on defendants' corporation, 43 F.R.D. at 501; the relief (rescission and punitive damages) being sought was sufficiently attractive to suggest that individual actions would be brought if class treatment were denied (at least $14,076 being claimed by one named plaintiff), 53 F.R.D. at 669; giving notice as required by Rule 23(c)(2) would be extremely expensive and difficult in view of the large number of class members, scattered throughout the country, many of whom could not readily, if at all, be located, *Id.*, 669, 690; *see also* 43 F.R.D. at 499–501; the likelihood of recovery was "so slight," there being "no substantial possibility that plaintiffs [would] succeed on the merits," that the enormous expenses and inconveniences of a class action were not justified, 53 F.R.D. at 668–669.

In sum, the Court's decisions in *Dolgow* were colored by collateral consequences of maintenance of this particular class action, the likelihood that individual actions would be brought seeking vindication of whatever meritorious grievances were involved, the judicial management problems (particularly with respect to notice), and the extremely weak case on the merits.

Because of these factors, Judge Weinstein apparently felt that a class action was not a superior method of adjudicating the controversy, one of the requirements for class maintainability under Rule 23(b)(3). *Id.*, 667–668. He subsequently granted summary judgment, and the case was dismissed with prejudice. *Id.*, 691.

On appeal again, this time the Second Circuit affirmed his separate orders denying class maintainability and entering summary judgment in favor of defendants. Dolgow v. Anderson, 464 F.2d 437 (1972).

Sparse authority is supportive of the *Dolgow* approach. Milberg v. Western Pacific Railroad Company, 51 F.R.D. 280 (S.D.N.Y.1970), appeal dismissed 443 F.2d 1301 (2d Cir. 1971). *See also* Ray v. Rockefeller, 352 F.Supp. 750, 757 (N.D.N.Y.1973); Buford v. American Finance Company, 333 F.Supp. 1243, 1252 (N.D.Ga.1971). *See generally* Simon, Class Actions—Useful Tool or Engine of Destruction, 55 F.R.D. 375 (1973); Katarincic & McClain, Federal Class Actions Under Rule 23: How to Improve the Merits of Your Claim, 33 U.Pitt.L.Rev. 424 (1972).

But a substantial body of authority has developed in opposition to *Dolgow.* In the leading case holding to the contrary, Judge Metzner refused to hold a preliminary hearing on the merits, terming it "a fact-finding procedure that would deprive the plaintiff and the class of the right to a jury trial. It would turn rule 23 into a cumbersome procedure." Mersay v. First Republic Corporation of America, 43 F.R.D. 465, 469 (S.D.N.Y.1968). While the disparity between *Dolgow* and *Mersay* was left unresolved, Green v. Wolf Corporation, 406 F.2d 291, 301–302 n. 15 (2d Cir., 1968), cert. denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969), the weight of authority within the Second Circuit heavily favored *Mersay. See* Sunrise Toyota Ltd. v. Toyota Motor Company, 55 F.R.D. 519, 534 (S.D.N.Y. 1972); Berland v. Mack, 48 F.R.D. 121, 132 (S.D.N.Y.1969); Weiss v. Tenney Corporation, 47 F.R.D. 283, 294 (S.D.N.Y.1969); Fogel v. Wolfgang, 47 F.R.D. 213, 215, n. 4 (S.D.N.Y.1969).

Whatever lingering uncertainty that may have existed as to the status of holding a *Dolgow* hearing was firmly resolved in the May 1, 1973, decision on the matter by the Second Circuit. Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973) *(Eisen II)*, cert. granted, 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146 (1973). The Court there unequivocally deemed the holding of a preliminary "merits" hearing to be improper and unauthorized under Rule 23. *Id.,* 1015–1016.

Outside the Second Circuit, the weight of authority likewise rejects *Dolgow*. In Miller v. Mackey International, Inc., 452 F.2d 424 (5th Cir. 1971), a securities class action of dimensions similar to *Dolgow*, the Fifth Circuit deemed it error to inquire into the merits of a complaint in determining maintainability of a class action.

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." 452 F.2d at 427.

In *Miller* the Court found a *Dolgow* hearing not justified by the language or history of Rule 23, nor by the recognized "serious consequences" attendant upon approval of a class. *Id.,* 428. *Miller* did, however, suggest that even without a preliminary hearing on the merits, relief may be available from "purely vexatious litigation" in the form of a motion for summary judgment under Rule 56. *Id.,* 428–429.

In the Third Circuit, the *Dolgow* approach also has been rejected. Dealing with an antitrust action involving an immense class (all State and municipal governments, governmental authorities, and subdivisions in the United States; more than two dozen cooperative electricity supplying corporations; and home and apartment building constructors in the Eastern District of Pennsylvania), only a minimal showing of merit was required prior to determination of class maintainability. Philadelphia Electric Company v. Anaconda American Brass Company, 43 F.R.D. 452 (E.D.Pa. 1968). The Court ruled that it was sufficient at this point to sustain a class action that the claim "may have merit and is a genuine issue in this litigation." *Id.,* 458.

In accordance with that case, the Third Circuit Court of Appeals has subsequently used language strongly denoting disapproval of *Dolgow*. In Kahan v. Rosentiel, 424 F.2d 161 (3rd Cir. 1970), cert. denied sub nom., Glen Alden Corporation v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290, the Court said that consideration of the merits of a complaint has no place in the calculus of determining maintainability as a class action under Rule 23(c)(1).

"The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action, conforming to Rule 23, and still be dismissed for failure to state a cause of action." 424 F.2d at 169.

*See also* Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969).

Subsequent Third Circuit cases, many of them presenting manageability problems on a par with *Dolgow*, have viewed *Kahan* as unequivocally precluding the holding of preliminary "merits" hearings prior to determination of class maintainability. Tober v. Charnita, Inc., 58 F.R.D. 74, 85 (M.D.Pa.1973); City of Philadelphia v. American Oil Company, 53 F.R.D. 45, 61 (D.N.J. 1971); Cusick v. N. V. Nederlandsche Combinatie Voor Chem. Ind., 317 F. Supp. 1022, 1024 (E.D.Pa.1970); Sol S. Turnoff Drug Dist. Inc. v. N. V. Nederlandsche, Etc., 51 F.R.D. 227 (E.D.Pa. 1970); City of Philadelphia v. Emhart Corporation, 50 F.R.D. 232 (E.D.Pa. 1970).

Similar reasoning has prevailed within other Circuits, as well. In Berman v. Narragansett Racing Association, 48 F. R.D. 333, 338 (D.R.I.1969), the Court rejected an evidentiary hearing prior to determination of maintainability on behalf of a class comprised of at least 5,000 members. Within this District *Dolgow* has been rejected as erecting a cumbersome fact-finding procedure leading to resolution of ultimate issues without affording right to jury trial. Vernon J. Rockler and Company v. Graphic Enterprises, Inc., 52 F.R.D. 335, 347–348 (D.Minn.1971).

The leading commentators subscribe to this view, favoring the bypassing of extensive examination of the merits prior to determining maintainability under Rule 23(c)(1). Professor Moore suggests that all that is preliminarily required is a "minimal demonstration" that the claim is sincere and that the aggregate group claim is substantial or that the claim is "more than frivolous or speculative." 3B Moore's Federal Practice Para. 23.45[3] (1969). *Cf.* City of Philadelphia v. Emhart Corp., *supra*, 234–235; Philadelphia Electric Company v. Anaconda American Brass Company, *supra*, 458.

The case at bar clearly satisfies these standards. This action appears to have been brought in good faith and by persons claiming to be representative of interests in lost vacation pay amounting to $1,750,000. The Court is well equipped under Rule 23(d) with means of ferreting out claims or issues that properly should be stricken from this action.

Professors Wright and Miller likewise hold *Dolgow* in disfavor.

"On balance, foregoing an evidentiary hearing except in exceptional cases represents the better resolution of this conflict in as much as the Rule 23(c)(1) decision can be rendered in most cases without harassing expense and publicity adverse to defendant." Wright & Miller, Federal Practice and Procedure, *supra*, § 1785, p. 136.

In sum, *Dolgow* is not good law within its own Circuit, is invariably rejected by case law outside its Circuit, and is disfavored by leading commentators. Moreover, even if the holding of a preliminary "merits" hearing is justifiable in the context of the facts as presented in *Dolgow*, the case at bar is vastly distinguishable.

■ There is no indication here that determination by the Court that this action may be maintained as a class action in itself would prompt adverse stock market repercussions for defendants, as was thought to be likely in *Dolgow*. 43 F.R.D. 472, 501. Moreover, whereas the substantial amounts of damages being claimed by individuals in *Dolgow* assured the Court there that some individual actions would be brought if the class action were denied, 53 F.R.D. 664, 669, a contrary situation is presented in the case at bar. Although the Court has not yet been provided with precise figures pertaining to totals of vacation pay lost by the terminated employees to which they allegedly were entitled, from the provisions of the master agreement, §§ 30–33, it is fair to surmise that, assuming weekly salaries in the $150–$200 range, nearly all the class members would have grievances amounting to less than $1,000 each.[2] It is highly unlikely that many of them would find it practicable to bring legal actions on their own behalf for such relatively insubstantial sums. *See* Eisen v. Carlisle & Jacquelin, 370 F.2d 119, 120 (2d Cir. 1966) (*Eisen I*), cert. denied, 386 U.S. 1035, 87 S.Ct.

2. In their amended complaint, plaintiffs estimate that there are a total of 10,000 unpaid weeks of vacation owing to the class, valued at $175 per week, for total damages against Swift and Amalgamated of about $1,750,000, plus statutory and exemplary damages. In a previous Order in this case, the Court has ruled that the recovery, if any, should be in the form of individual judgments against Amalgamated and Swift, rather than a joint judgment as originally prayed for by plaintiffs.

1487, 18 L.Ed.2d 598 (1967); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 566, n. 16 (2d Cir. 1968) (*Eisen II*).

Other considerations also counsel against following the *Dolgow* prescription advanced by defendants here.

Judicial management problems, primarily those attendant the giving of notice under Rule 23(c)(2), loomed large in *Dolgow*. 43 F.R.D. 472, 499–501; 53 F.R.D. 664, 669, 690. But in the case at bar, for reasons discussed *infra*, management problems appear to be relatively slight. Similarly, notice does not cast a foreboding spectre in the instant case, as it did in *Dolgow*.

The only arguably comparable facet of this case and *Dolgow* pertains to the likelihood of plaintiffs prevailing on the merits. In *Dolgow* and the major case to follow its reasoning, Milberg v. Western Pacific Railroad Company, *supra*, 282, extremely weak cases were presented. Combined with the attendant management problems and other burdens posed by those unwieldy cases, it may have been eminently sensible there to attempt to pierce the complaints and determine if the prospective class action burdens on the parties and the Court could be averted. This gave impetus to the preliminary hearing requirement.

The Court recognizes that plaintiffs similarly face a difficult task to prevail on the merits in this action. To do so they must show that Amalgamated breached its duty of fair representation and that they were entitled to vacation pay from Swift under the terms of the master agreement. *See* Vaca v. Sipes, 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

■■ To surmount the first obstacle, they must satisfy the heavy burden under the Vaca v. Sipes standard. This requires a showing that Amalgamated's conduct in handling and ultimately settling the vacation pay grievances was at least "arbitrary, discriminatory, or in bad faith," 386 U.S. at 190, 87 S.Ct. at 916, 17 L.Ed.2d 842, or that the grievance was processed "in [a] perfunctory fashion." *Id.*, 386 U.S. at 191, 87 S.Ct. 903, 17 L.Ed.2d 842. That the claims may have been meritorious is not determinative. *Id.*, 386 U.S. at 195, 87 S.Ct. 903, 17 L.Ed.2d 842. Moreover, a mere swap of benefits for one group of employees at the expense of others is not necessarily violative of the duty, provided it was undertaken by the union with "good faith and honesty of purpose in the exercise of its discretion." Local 13, International Longshoremen's & W. U. v. Pacific Maritime Assn., 441 F.2d 1061, 1067 (9th Cir. 1971), quoting Ford Motor Company v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

The very demanding standard of Vaca v. Sipes is difficult to satisfy in practice as well as in theory. *See generally* Lehmann, The Union's Duty of Fair Representation—Steele and its Successors, 30 Fed.B.J. 280 (1971). But there are indications in the depositions of the two named plaintiffs of possible discrimination in handling these grievances vis-a-vis similar complaints at other plants, alleged "extortion" demands made by Amalgamated officials to process the grievances here, and possible undue delay by Amalgamated in handling the matter. Furthermore, sheer numerical considerations suggest at least arguable culpability on the part of Amalgamated. Fewer than 70 senior Swift employees were enriched, while from 850–1,500 less-entrenched employees came away from the settlement empty-handed. Further discovery may turn up more compelling evidence. In any event, there seems at this stage to be a minimally arguable basis for the duty of fair representation claim.[3]

3. Many commentators have criticized the Vaca v. Sipes standard, claiming it is unjustifiable to require an aggrieved employee to sustain such a heavy burden against the un-

Even if plaintiffs hurdle this test, the contractual language of the master agreement still poses a substantial barrier to their prevailing on the merits. Defendants' position basically is that because of the November 29, 1969, closure of the bulk of plant operations and termination of employment on that date, or December 27, at the latest, the aggrieved claimants were not on the "active payroll" on December 28, as required for eligibility for vacation pay under the terms of § 32 of the master agreement. Hence, they maintain, Swift cannot be liable. Moreover, the clarity of the language in this and other pertinent provisions of the master agreement, they argue, precludes a finding that in entering the settlement Amalgamated was guilty of bad faith under the standard of Vaca v. Sipes. In the face of this contractual language, they say, it was undisputably reasonable to settle the grievance.

Despite the literal terminology of the master agreement, plaintiffs conceivably could prevail on the merits. The December 28 eligibility date could be disregarded on the basis of the traditional contractual doctrine of wrongful prevention, or voluntary disablement, by the promisor eliminating a condition precedent to liability. 6 Corbin, Contracts § 1362, p. 509 (2d ed. 1962); First Restatement on Contracts § 415 (1932).

Federal case law also provides support for disregarding the black-letter terms of the master agreement in order to afford compensatory relief to terminated employees. Schneider v. Electric Auto-Lite Company, 456 F.2d 366 (6th Cir. 1972); Local Union No. 186, United Packinghouse, Goods and Allied Workers, AFL-CIO v. Armour & Company, 446 F.2d 610, 615 (6th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972); Smith v. Kingsport Press, 366 F.2d 416, 420 (6th Cir. 1966). Arbitration cases also may fuel plaintiffs' cause. Star Woolen Mill Company, 14 L.A. 185 (1950); L. Hyman Company, Inc., 13 L.A. 803 (1949); Mays Landing Water Power Company, 12 L.A. 861 (1949).

■ There is State case law to the contrary, e. g., Treloar v. Steggeman, 333 Mich. 166, 52 N.W.2d 647 (1952), including a highly pertinent one in Minnesota. Tynan v. KSTP, Inc., 247 Minn. 168, 77 N.W.2d 20 (1956). But since this action under § 301 of the Labor Management Relations Act is a matter of Federal law, Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 456-459, 77 S.Ct. 212, 1 L.Ed.2d 972 (1957), State law regarding interpretation of the collective bargaining agreement would not be controlling here. Schneider v. Electric Auto-Lite Company, *supra*, 371.

It is, of course, premature for the Court to resolve these legal issues. The Court does, however, recognize the difficulties confronting plaintiffs on the issues they face for recovery in this action. Nevertheless, their prevailing on

---

ion. *See* Local 13, International Longshoremen's & W. U. v. Pacific Maritime Assn., supra, 1068, n. 12. Recognition of this severity has prompted some courts to suggest that a less demanding standard might be in order when a genuine class action is presented. The plaintiff in *Vaca* was an individual employee aggrieved by the union's refusal to take his allegedly wrongful discharge to arbitration. In comparable instances, the interests of the union in serving its many members ordinarily will outweigh the interests of a single employee. *See* Summers, Individual Rights in Collective Agreements and Arbitration, 37 N.Y.U.L.

Rev. 362 (1962). In a class action, however, more employees are adversely affected by the union's conduct. Hence, more compelling interests must be balanced against those of the union. Rothlein v. Armour & Company, 391 F.2d 574, 580, n. 30 (3rd Cir. 1968). The allusion in *Rothlein* to carving out a test in class actions based on an "infirmity less" than the Vaca v. Sipes standard, *Id.*, 580, has been noted by the Ninth Circuit. Local 13, International Longshoremen's & W. U. v. Pacific Maritime Assn., *supra*, 1068, n. 12. *See also* Bieski v. Eastern Auto Forwarding Company, 396 F. 2d 32 (3rd Cir. 1962).

the merits does not seem so far beyond the realm of possibility as to warrant further procedural impediments to resolution of this case. Section 301 suits should "not be dragged out indefinitely by procedural or preliminary controversies." Rothlein v. Armour & Company, n. 3, *supra,* 578.

For these reasons, the Court finds *Dolgow's* reasoning inapplicable to the case at bar and refuses to accept defendants' suggested interposition of a preliminary hearing on the merits prior to determination of maintainability as a class action under Rule 23(c)(1). In the alternative, defendants request that a determination regarding class maintainability be deferred until discovery is completed and after adjudication of the motion(s) for summary judgment they then intend to make. In this way, they argue, if the Court finds summary judgment is in order, its granting will avoid further burdens imposed by notice and other management problems.

■ The cases and the commentators suggest that a summary judgment hearing under Rule 56 may do service where a preliminary hearing on the merits is not permissible, or advisable. *E. g.,* Miller v. Mackey International, Inc., *supra,* 428–429; Sunrise Toyota Ltd. v. Toyota Motor Company, *supra,* 534; Wright & Miller, Federal Practice and Procedure, *supra,* § 1785, pp. 136–137. But an accelerated summary judgment procedure must nevertheless await reasonable opportunity for the plaintiffs to complete discovery on the issues material to the Rule 56 determination. *See* Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *cf.* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); First National Bank of Arizona v. Cities Service Company, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

■ Plaintiffs have indicated their intention to conduct further discovery of several Amalgamated and Swift officials and for further inspection of defendants' records. The Court feels that this is necessary and proper for purposes of contesting summary judgment, provided it is expeditiously done. Nearly two years have elapsed since this suit was commenced, and Federal labor policy dictates that such suits be adjudicated as rapidly as possible. Rothlein v. Armour & Company, n. 3, *supra,* 578.

In view of the decisions reached here by the Court, plaintiffs may be expected to and should press forward with vigor in the discovery process. Because notice problems here do not seem particularly awesome, the Court feels that any motion(s) for summary judgment should be delayed until further discovery is conducted and notice is given. *Cf.* Tober v. Charnita, Inc., *supra,* 85–86. Should summary judgment under Rule 56 subsequently be sought by and rendered in favor of defendants, it then would have class-wide res judicata effects on all those who do not opt out of being class members upon being provided with notice.

II. *Maintainability as a Class Action*

Refusing to postpone ruling on plaintiffs' motion, the Court now turns to consideration of the maintainability of this suit as a class action under Rule 23. The Court first observes that it approaches the issue with the recognition that, as remedial legislation, Rule 23 has generally been accorded a liberal interpretation. Eisen v. Carlisle & Jacquelin *(Eisen II), supra,* 391 F.2d at 563; Escott v. Barchris Construction Corp. 340 F.2d 731, 733 (2d Cir. 1965), cert. denied, sub nom. Drexel & Company v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed. 2d 63; Siegel v. Chicken Delight, Inc., *supra,* 724. " [I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." Esplin v. Hirschi, *supra,* 99.

To be entitled to maintain this suit as a class action, plaintiffs must initially satisfy the four prerequisites of Rule 23(a).

 The first requirement, numerosity of class members making joinder impracticable, 23(a)(1), is clearly met here. The parties, and the Court, are uncertain at this stage in the proceedings of the precise number of persons includible in a class composed essentially of those aggrieved by the alleged breach of duty and nonpayment of assertedly earned vacation pay. It apparently numbers between 850–1,500 persons. That plaintiffs have failed to state the exact number of persons in the class does not, of course, preclude the maintenance of this as a class action. Dolgow v. Anderson, *supra,* 43 F.R.D. at 493. Even the minimally suggested size of 850 class members would suffice to make joinder impracticable. *See* 3B Moore, *supra,* Para. 23.05, pp. 271–281; Arkansas Ed. Ass'n v. Board of Ed., Portland, Ark. Sch. Dist., 446 F.2d 763, 765 (8th Cir. 1971) (fewer than two dozen class members); Goldstein v. North Jersey Trust Company, 39 F.R.D. 363, 367 (S.D. N.Y.1966).

 There also are common questions of law or fact, satisfying 23(a)(2). The common legal issues include whether Amalgamated breached its duty of fair representation in entering the settlement agreement and the effect of the closure of the South St. Paul plant on the interpretation of the eligibility provisions of the master agreement, §§ 30–32. Both of these threshold legal questions are of general applicability to the class.

Defendants strenuously argue that the typicality requirement of 23(a)(3) is not satisfied. Rule 23(a)(3) mandates that the claims or defenses of the representative parties be typical of the claims or defenses of the class members. Defendants contend that named plaintiff Buchholtz cannot satisfy this provision in view of his unusual work history and status with Swift. A veteran Swift employee, Buchholtz injured his back and was unable to work after June 30, 1969. From that time through February, 1970, he received sickness and accident benefits from Swift plus workmen's compensation and Social Security disability payments while on the benefit payroll. He had been transferred to that payroll from the active payroll and remained there during the last half of 1969, in accordance with § 67 of the master agreement.

Accordingly, it is argued, that because he was not on the active payroll for 270 calendar days during the vacation eligibility year, he is not eligible for vacation payments under § 32(3) of the agreement. Not being eligible for vacation pay, he is asserted to be an atypical and hence improper class representative.

It also is contended that Buchholtz and Tauer are improper class representatives because of various remarks they made during their depositions that indicated they did not support the claims of certain individuals who literally would fall within the ambit of the class they seek to represent. Buchholtz, for instance, said that he does not think that those Swift employees are eligible for vacation pay who terminated employment between January 1, 1969, and May 29, 1969, the date upon which the impending closure was announced. Tauer likewise appeared to read out those fired for cause prior to May 29 and those who quit between the announcement and actual closure in order to pursue other employment elsewhere. These admissions were made notwithstanding Buchholtz and Tauer were then seeking to represent all persons who worked at Swift any time during 1969.

Although there is doubt as to the precise meaning of 23(a)(3), 2 Barron & Holtzoff, Federal Practice and Procedure § 562, n. 3 (Wright ed. 1966 Supp.), the Court does not find any of defendants' arguments persuasive.

Being on the benefit payroll for much of 1969 does not *a fortiori* preclude Buchholtz's eligibility for vacation pay. Defendants' argument overlooks that other alternatives of § 32 of the master agreement may be satisfied, even if he cannot qualify for vacation by being on the payroll during 270 calendar days under § 32(3). In particular, he might be eligible under § 32(1), assuming he can hurdle the December 28 closure argument, common to all members of the class.

 The assertedly fatal concessions were extracted from Buchholtz and Tauer after repeated examination during the course of their lengthy depositions extending over several days and spanning an interval in excess of three months. As laymen, they clearly were not conversant with the controlling legal issues involved in this action. Their hostility, if any, to other potential class members does not go "to the subject matter of the suit." Redmond v. Commerce Trust Company, 144 F.2d 140, 151 (8th Cir. 1944), cert. denied, 323 U.S. 776, 65 S.Ct. 187, 89 L.Ed. 620, reh. denied, 323 U.S. 819, 65 S.Ct. 557, 89 L. Ed. 650 (1945); Rogers v. Tri-State Materials Corporation, 51 F.R.D. 234, 250 (N.D.W.Va.1970).

There is a judicially recognized doctrine that existence of a common scheme affecting the class satisfies the typicality requirement. *See generally* 3B Moore, *supra,* Para. 23.06–2; Mersay v. First Republic Corp. of America, *supra,* 468. *But see* Vernon J. Rockler and Company v. Graphic Enterprises, Inc., *supra,* 343, n. 14 (equating the typicality requirement with the existence of common questions under 23(a)(2) ascribes a "needless duplicity" to Rule 23). Under this view, the alleged conduct of Amalgamated in processing and ultimately settling the grievance as well as Swift's across-the-board refusal to make the vacation payments would suffice to meet the requirement of 23(a)(3).

 A more pervasive approach views 23(a)(3) as being satisfied whenever there are co-extensive interests on the part of the representatives and class members or the absence of interests on the part of the representatives that are antagonistic to the interests of the absentees. *See generally* 3B Moore, *supra,* Para. 23.06–2; Vernon J. Rockler and Company v. Graphic Enterprises, Inc., *supra,* 340–341. Buchholtz and Tauer each satisfies both alternatives of this standard because each shares the same pecuniary interests in this claim against Amalgamated and Swift as do the other class members and the deposition answers of each do not in fact demonstrate a substantive hostility to the interests of the absentees.

The Eighth Circuit recently has implied that the typicality requirement involves a desire for similar relief. Ihrke v. Northern States Power Company, 459 F.2d 566 (8 Cir. 1972). In *Ihrke* the Court affirmed the denial of class treatment on the ground that the entire class might not have favored the kind of relief sought by the representatives. *Id.,* 572–573. The opposite is true in the case at bar; all members of the class stand to benefit from and undoubtedly would favor the monetary relief from Amalgamated and Swift that the named plaintiffs seek to obtain.

 In considering fairness and adequacy of representation, under 23(a)(4), "the primary criterion is the forthrightness and vigor with which the representative parties can be expected to assert and defend the interests of the members of the class . . . ." Mersay v. First Republic Corporation of America, *supra,* 470. Since the Court has already noted that the allegedly antagonistic statements extracted from the named plaintiffs during the depositions do not go "to the subject matter of the suit," Redmond v. Commerce Trust Company, *supra,* 151, there does not appear to be any potential rivalry between them and the

absent class members. The interests of the representatives are coextensive and wholly compatible with those of the class members. Furthermore, the Court is convinced that their counsel will fairly and skillfully prosecute this action with vigor in behalf of all class members.

■ Tauer's previous experiences while representing the predecessor international union in the unrelated closing of a New England plant under similar circumstances in 1961 does not, as defendants argue, make him an inadequate representative. Even though the relevant contract language there was comparable to the master agreement here and Tauer did not then make a demand for vacation pay for 1961 work, these factors do not invoke estoppel or any other adverse legal principle applicable to his participation as a representative party in this action. The Court feels that Buchhlotz's and Tauer's substantial previous experiences in local and international union affairs provide them with potentially insightful viewpoints that augment the adequacy of their representation. As a veteran official of the local and international, former president of the local union, P–167, and current president of Club 167, Tauer, in particular, is suitably cast for his role in this case. *Cf.* Mersay v. First Republic Corporation of America, *supra,* 468.

■ Although there are only two representatives here, adequacy of representation is largely a matter of quality, not quantity. *See* Vernon J. Rockler and Company v. Graphic Enterprises, Inc., *supra,* 343, and cases cited therein. If one person can sue in behalf of a class of about 3,750,000, as in Eisen v. Carlisle & Jacquelin, the Court is not deterred by the prospect of there being but two persons here representing some 850–1,500 class members. Furthermore, utilizing the inherent flexibility afforded it under Rule 23(c)(1), the Court might later order the intervention of additional representative par-

ties if deemed necessary at a subsequent stage of the proceedings.

Having met the requirements of Rule 23(a)(3), plaintiffs must next satisfy one of the standards of 23(b). The pertinent provision here is (b)(3), permitting a class action when the common questions predominate over questions affecting only individual members and the class action is superior to alternative methods for the fair and efficient adjudication of the controversy.

■ With regard to predominance of common questions, "[t]he fundamental question is whether the group aspiring to class status is seeking to remedy a common legal grievance." 3B Moore, *supra,* Para. 23.45[2], p. 23–756. That clearly is the situation here. The purported class members are aggrieved by the alleged breach of duty of fair representation by Amalgamated that resulted in the corollary discomfiture of their losing out on what they claim is their earned vacation pay for the year 1969. The critical and overriding question is whether Amalgamated breached its duty in handling the settlement agreement.

■ If Amalgamated did not breach its duty of fair representation, the settlement would be valid and, under § 59 of the master agreement, would be binding here. Hence, neither Amalgamated nor Swift could be held liable. *See* Vaca v. Sipes, *supra,* 386 U.S. 186, 203, 203–204, 87 S.Ct. 903, 17 L.Ed.2d 842 (Black, J., dissenting). If, however, the union breached its duty, neither defendant would be immunized. The settlement not being valid, the issues of interpretation of the terms of the master agreement pertaining to vacation eligibility would then be reached.

The duty of fair representation issue, therefore, is a threshold matter. This is a common question, partaking of no individual issues as to particular class members. The legal effect of the December 27 plant closure likewise has class-wide impact. Whatever individual

factual questions remain, including measurement of individual damages if plaintiffs prevail on their complaint, can await resolution until individual claims are advanced on behalf of members of the class, should defendants be found liable.

 Class action treatment also appears to be a superior method of adjudication here. It has often been recognized that a class action serves a valuable policing function for remedying legal wrongs when individual claims are too small and hence unlikely to be brought. *E.g.,* Eisen v. Carlisle & Jacquelin *(Eisen I), supra,* 391 F.2d at 567, n. 19; Escott v. Barchris Construction Corp., *supra,* 733; State of Minnesota v. United States Steel Corp., n. 1, *supra,* 572.

This policing or therapeutic function is especially relevant to controversies such as this one involving a union's alleged breach of its duty of fair representation. It has been suggested that Federal labor policy may favor that such actions brought on a class basis be adjudicated according to a less stringent standard than ordinarily prevails when an individual seeks recovery on similar grounds. The rationale for this "lesser infirmity" approach is that in cases involving large numbers of aggrieved employees, the balancing process does not pit the relatively insubstantial interests of a solitary individual against the much more weighty concerns usually supporting the union's conduct, as was the case in Vaca v. Sipes. *See* n. 3, *supra.*

The Court has considered the four factors listed under Rule 23(b)(3) and finds none of them adverse to maintenance of this case as a class action. There are no apparent interests of individual class members in controlling prosecution or defense of separate actions. Rule 23(b)(3)(A). More than two years have passed since the controverted settlement was made, many of the terminated employees were aware of the grievances prior to the filing of this suit, and many of them are cognizant of its pendency here. During the nearly two years since its initiation in this forum, there has been no indication that any of the aggrieved individuals desires personal control over litigation of his claim.

The absence of any separate lawsuits on the same subject matter clearly suggests this disinterest in pursuing and guiding individual claims. Zeigler v. Gibralter Life Insurance Company, 43 F. R.D. 169, 173 (D.S.D.1967). The aforementioned relatively small amounts involved in individual grievances confirms this view. *See* Proposed Rules of Civil Procedure, Advisory Committee's Notes, 39 F.R.D. 69, 104 (1966). Additionally, there always is the possibility of individual members opting out once notice is given, should they truly desire to control the destinies of separate actions. Vernon J. Rockler and Company v. Graphic Enterprises, Inc., *supra,* 347.

Because of this absence of any pending litigation, 23(b)(3)(B) is a nullity here.

 A number of reasons indicate the desirability of concentration litigation in this forum. Rule 23(b)(3)(C). Most of the class members reside in the Minneapolis-St. Paul metropolitan area and thus would have relatively easy access to this Court. Moreover, there are significant issues of Federal law that must be decided in this case. It would be preferable to have them adjudicated here, rather than raise the possibility of their being dealt with in whatever individual actions might be brought in State courts. Being based in Illinois, Amalgamated also would tend to benefit from having as much of the controversy as possible be determined in this single action rather than facing the prospect of having to defend whatever multiple individual actions are brought in State courts in Minnesota or elsewhere.

Lastly, unlike "big" class action suits, typified by securities actions such as *Dolgow* and antitrust actions such as Eisen v. Carlisle & Jacquelin, man-

agement problems are likely to be relatively insubstantial here. Rule 23(b)(3)(D). There are readily definable legal and factual issues; the number of class members is not exceedingly large; most of the class members are located in a compact area; and they can be reached with notice, mandated by 23(c)(2), without enormous difficulties. In view of the character of the controversy and the parties and with reliance on the traditional flexibility afforded by Rule 23, the Court does not envision management problems of sufficient magnitude or complexity to justify denying maintainability of the class action under 23(b)(3)(D).

Accordingly, the Court concludes that this suit may be maintained as a class action.

### III. *Determination of the Class*

Plaintiffs have thrice altered the definition of the class that they seek to represent. Initially, they pleaded a class comprised of all employees at Swift's South St. Paul plant at any time during 1969 whose employment was terminated between May 29 and November 29 of that year and who were members of the local bargaining unit during this time and who did not receive their "entitled" vacation pay for that year. Reference to the non-receipt of "entitled" vacation pay was stricken in the amended complaint. The class subsequently was modified, plaintiffs then seeking to represent a class encompassing all of Swift's South St. Paul employees during 1969 whose last day of reporting for "work or out [sic] work" was on or before November 29, 1969, and whose terms of employment were covered by the master agreement in effect for 1967–1970.

At the hearing on their motion plaintiffs admitted that the termination of any employee prior to May 29, 1969, the date of announcement of the impending closure, was not related to the controverted grievance whose settlement by the union predicates this action. The

class was pleaded so broadly, they said, solely for "fiduciary purposes," to avoid overlooking any possible claimants. Willing to drop from its class those who terminated employment as Swift prior to May 29, plaintiffs now seek to add to the class those whose employment ended between November 29 and the actual December 27 closure.

Between 850–1,500 employees were terminated in conjunction with the 1969 closure. Most of them departed on or before November 29, a few continued to work as late as December 27, 1969. All of them comprise the group whose grievance is here at issue.

Because interpretation of the pertinent provisions of the master agreement, §§ 30–32, are questions to be resolved in this action, the Court does not find it advisable to define the class according to the literal eligibility requirements of the agreement. Moreover, there is no practicable way at this stage of the proceedings to know which employees fall into the various categories for eligibility for vacation pay under § 31.

Accordingly, the Court now determines the class to be as follows:

All persons who were employed by Swift & Company at its South St. Paul meat packing plant at any time during the year 1969, and whose employment there was terminated between a time period beginning on or after May 29, 1969, and ending before or on December 27, 1969, and whose terms of conditions of employment were set forth, in whole or in part, in an agreement designated as "Swift & Company Master Agreement with the United Packing House, Food and Allied Workers AFL–CIO, September 1, 1967, to September 1, 1970."

Defining the class in this manner does raise the possibilities of including a number of persons who may not in fact be eligible for vacation pay for 1969. As defendants have pointed out, there is a serious question whether those who vol-

untarily quit working for Swift prior to satisfaction of any of the alternatives of § 32 of the master agreement are entitled to any vacation pay for the year. Similarly, those who had not yet satisfied the requirements for their first vacation appear to be excluded from consideration of the terms of § 32. So, too, would those who were scheduled to retire at the end of the year. Moreover, there is an apparently sizeable number of employees who transferred to other Swift plants and accordingly received full vacation pay for 1969.

But whether particular persons are eligible for vacation pay, and their respective amounts due, constitute individual questions that do not predominate in this action over the common issues regarding the union's conduct in handling the grievances and the interpretation of the pertinent contractual provisions. These matters can be resolved subsequently, should liability be found, when individual class members come forward with their claims. At that time, if it is reached in this case, they will have to establish their own eligibility under §§ 31–32 and the amount of vacation pay owing to them under § 33.

Because this action was filed November 26, 1971, defendants contend that those who terminated employment at Swift prior to November 26, 1969, are barred from being included in the class by virtue of the two-year statute of limitations under Minnesota law. The Court disagrees with this argument.

■ Congress has not legislated a statute of limitations for the bringing of actions under § 301 or for duty of fair representation claims. With respect to the former, it is clear that the six month limitations period for unfair labor practice claims, 29 U.S.C. § 160(b), is not pertinent. In Interna-

tional Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), AFL–CIO v. Hoosier Cardinal Corporation, 383 U.S. 696, 705, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), the Supreme Court said that, with the absence of an explicit Federal limitations period, the applicable period "is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations." That case involved a suit brought by the union against the employer, claiming that discharged workers were entitled to accumulated vacation pay. The Court accepted the District Court's application of the Indiana six year statute pertaining to oral contracts since the action was partially based on written agreements and partially on oral contracts of each employee. This kind of suit, the Court noted, was comparable to a common law contract action. 383 U.S. at 705, n. 7, 86 S.Ct. 1107, 16 L.Ed.2d 192.

■ Since the employees' § 301 complaint here against Swift pertains to vacation pay allegedly due them under the terms of the master agreement, it follows from the reasoning of the *Hoosier Cardinal* case that the Minnesota statute of limitations for contract actions is applicable.[4] *See* St. Louis Typographical Union No. 8 v. Herald Company, 277 F.Supp. 276, 279 (E.D.Mo.1967), aff'd 402 F.2d 553 (8th Cir. 1968). In Minnesota there is a six year limitations period for contractual actions. M.S.A. § 541.05(1). The cause of action having accrued some time in 1970, when the employees were first eligible to take the vacation pay they allegedly earned in 1969, Kohout v. Shakopee Foundry Company, 281 Minn. 401, 162 N.W.2d 237 (1963), none of the employees who departed pre-November 26, 1969, is barred in this action vis-a-vis Swift.

---

4. Since Minnesota is the forum and the State where the major operative events occurred in this controversy, its law is the one that must be applied here. None of the parties has suggested otherwise. *See* International

Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), AFL–CIO v. Hoosier Cardinal Corporation, *supra*, 383 U.S. at 705, n. 8, 36 S. Ct. 1107, 16 L.Ed.2d 192.

■ A more difficult issue is presented with regard to the limitations period for the duty of fair representation claim asserted against Amalgamated. The Supreme Court has not spoken directly to this issue, and the lower Federal courts are split concerning the appropriate statute of limitations in these breach of duty actions. As in the case of § 301 suits against the employer, there is no Federal statute for duty of fair representation suits.

■ There being no Federal statute of limitations, "it is for the federal court to consider the character of the claim involved, and give effect to the nature and purpose of the federal act from which the claim derives and to the federal objectives pursued." *Abrams v. Carrier Corporation,* 434 F.2d 1234, 1251–1252 (2d Cir. 1970), cert. denied sub nom. *United Steelworkers of America, AFL–CIO v. Abrams,* 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971).

Although breach of the duty may be an unfair labor practice,[5] the six month Federal statutory period is not controlling. Rather, it is well established that, as in § 301 actions, reference must be made to the appropriate State limitations period. *E. g., Abrams v. Carrier Corporation, supra; Gray v. International Association of Heat and Frost Insulators and Asbestos Workers, Local No. 51,* 416 F.2d 313 (6th Cir. 1969); *Jamison v. Olga Coal Company,* 335 F. Supp. 454 (S.D.W.Va.1971); *Williams v. Dana Corporation,* 54 F.R.D. 473 (D. Mich.1971); *Sciaraffa v. Oxford Paper Company,* 310 F.Supp. 891 (D.Me.1970); *Falsetti v. Local Union No. 2026, United Mine Workers of America,* 249 F.Supp. 970 (W.D.Pa.1965), aff'd 355 F.2d 658 (3rd Cir. 1966).

The difficult problem concerns what is the most appropriate Minnesota limitations period that should be applied here. Although defendants have not specified the one upon which they rely, they apparently are resting upon § 541.07(5), which provides for a two year limitations period "[f]or recovery of wages, overtime, damages, fees or penalties accruing under any federal or state law respecting the payment of wages, overtime, damages, fees or penalties." Alternatively, they may be contending for application of the two year period for the bringing of certain tort actions. M. S.A. § 541.07(1). But the six year periods for contract actions, M.S.A. § 541.-05(1), for non-contractually based injuries to the "person or rights of another," § 541.05(5), and for fraud actions (running from the time of discovery of the fraud), § 541.05(6), also may be in point.

One theory emphasizes the statutory origin and character of the duty and calls for application of the appropriate State limitations period regarding actions arising under statutes. *Gray v. International Association of Heat and Frost Insulators and Asbestos Workers, Local No. 51, supra,* 316; *cf. Waters v. Wisconsin Steel Works of International Harvester Company,* 427 F.2d 476, 490 (7th Cir. 1970). Under this doctrine, the two year limitations period of M.S.A. § 541.07(5) would apply.

But this provision is not in point and even if so would not bar anyone in this action. Cases that have applied the Minnesota limitations period for monetary claims accruing under Federal Statutes are inapposite because they involved different considerations pertaining to the Fair Labor Standards Act of

5. Local Union 568 v. N.L.R.B., 126 U.S.App. D.C. 360, 379 F.2d 137 (1967) (unfair labor practice); Local 12, United Rubber, Cork, Linoleum, and Plastic Workers of America, A.F.L.–C.I.O. v. N.L.R.B., 368 F.2d 12 (5th Cir. 1966), cert. denied, 389 U.S. 837, 88 S. Ct. 53, 19 L.Ed.2d 99 (1967) (unfair labor practice); Miranda Fuel Company, 140 NLRB 181 (1962), enforcement denied, N.L. R.B. v. Miranda Fuel Company, 326 F.2d 172 (2d Cir. 1963) (*not* an unfair labor practice).

1938, 29 U.S.C. § 201 et seq., Smith v. Cudahy Packing Company, 76 F.Supp. 575 (D.Minn.1947), appeal dismissed 172 F.2d 223 (8th Cir. 1949); Peterson v. Parsons, 73 F.Supp. 840 (D.Minn.1947); Smith v. Cudahy Packing Company, 73 F.Supp. 141 (D.Minn.1947). Unlike these cases, the claims being sought here are not solely the creatures of Federal statutes. *Compare* Peterson v. Parsons, *supra*, 843. They derive essentially from the underlying collective bargaining agreement. Abrams v. Carrier Corporation, *supra*, 1252. *But see* De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL–CIO, 425 F.2d 281, 287 (1st Cir. 1970), cert. denied sub nom, Puerto Rico Telephone Company v. Figueroa De Arroyo, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114, reh. denied, 401 U.S. 926, 91 S.Ct. 863, 27 L.Ed.2d 831 (1971).

Other reasons counsel against applying § 541.07(5) here. Since plaintiffs suing under § 301 cannot overcome a defense of failure to exhaust contractual remedies unless they prove that the union breached its duty of fair representation, Vaca v. Sipes, *supra*, 386 U.S. at 186, 87 S.Ct. 903, 17 L.Ed.2d 842, both the employer, and the union will often be made defendants, as is true of the case at bar. Reference already has been made to the logic of applying the limitations period for contract actions to an employer-defendant under § 301.

But if a shorter statutory limitations period is applied to the union charged with breach of duty, aggrieved employees may in many situations find themselves barred from joining the union as a defendant. They could, of course, still proceed and prevail against the employer, provided they satisfy the Vaca v. Sipes standard as to bad faith on the part of the union. But because the action would, therefore, go forward even without the presence of the union, the traditional justification for a short limitations period is eroded. The argument

"that claimants should not be permitted to bring actions based on stale evidence long after the parties had a right to assume that the claim would not be pursued, is simply inapplicable; no matter what the disposition of the claim against the union, the claim against the employer, based on the same evidence, will still go forward." Abrams v. Carrier Corporation, *supra*, 1252.

In sum, in the case at bar it would make little sense if the two year limitations period were to be applied to Amalgamated while the longer contract statute of limitations applies to Swift. The case could still proceed, and the presumably "stale" evidence against the union could and would be brought to bear against Swift.

Assuming that § 541.07(5) is in point, it would not preclude this action. The statute has been construed as not commencing to run until the last date upon which the employees would be entitled to take, and get paid for, their vacations. Kohout v. Shakopee Foundry Company, *supra*. The Swift employees here were not eligible to take and get paid for their vacations allegedly earned in 1969 until some time in 1970. Therefore, the two year period under § 541.07(5) would not have been triggered until January 1, 1970, at the earliest. Since this action was brought less than two years after that date, it was within the statutory period.

Characterizing the breach of duty of fair representation as tortious, some courts have applied the State tort statutory period. De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL–CIO, *supra*; Brotherhood of Locomotive Firemen & Engineers v. Mitchell, 190 F.2d 308, 313 (5th Cir. 1951); Jamison v. Olga Coal Company, *supra*, 463; Tippett v. Liggett & Myers Tobacco Company, 316 F.Supp. 292, 298 (M.D.N.C. 1970).

Assuming a tort limitations period is applicable here, that would not bar any members of the class in this action. Characterized as tortious, the breach of duty of fair representation here would be a violation of the "rights" of the terminated employees. As such, it clearly would be governed by the six year limitations period of § 541.05(5), which encompasses most torts, rather than by the two year period of § 541.07(1), applicable only to certain enumerated torts not here in point. *See* American Mutual Liability Insurance Company v. Reed Cleaners, 265 Minn. 503, 122 N.W.2d 178 (1963).

Moreover, the tort analogy may be faulty because of the basic underlying differences between the duty of fair representation doctrine and that of ordinary tort law. In *De Arroyo*, the First Circuit equated the duty of fair representation with the due care concept of conventional tort law. 425 F.2d at 287. But as the standard of Vaca v. Sipes illustrates, the kind of conduct involved in a breach of duty is comparable to that which characterizes an intentional tort. 386 U.S. 171, 190–191, 87 S.Ct. 903, 17 L.Ed.2d 842. Fraud, rather than negligence, is the nearest benchmark to the duty of fair representation. Hence, the six year fraud statute of limitations, M.S.A. § 541.05(6), might be more appropriate. In any event, whether negligent or fraudulent, a six year period would apply here.

The better view would appear to be that the duty of fair representation claim here is to be governed by the six year limitations period for contract actions, M.S.A. § 541.05(1). As was said by the Second Circuit in *Abrams*, the claim against the union "is intimately related to the § 301 claim" against the employer since both stem from the same events and involve the same contractual provisions. 434 F.2d 1234, 1252. This view seems to comport with the underlying rationale of Vaca v. Sipes, the "sin-gle injury" theory that requires aggrieved employees to prove breach of duty on the part of the union as part of their § 301 suit against the employer under the collective bargaining agreement. In essence, there is but one gravaman here, Swift's refusal to pay the alleged earned vacation pay, with the damages enhanced by Amalgamated's alleged failure to live up to its duty of fair representation in handling this grievance. *Cf.* Fischer v. Brotherhood of Railroad Trainmen, 284 F.Supp. 491, 493 (W.D.Mo.1968).

Since this entire action revolves around application of the collective bargaining agreement, it should be governed by the six year Minnesota statutory period for bringing of contract actions. *See* Green v. McDonnell-Douglas Corporation, 318 F.Supp. 846, 849 (E.D. Mo.1970), rev'd on other grounds 463 F.2d 337 (8th Cir. 1972), vacated and remanded, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (State statute of limitations for contract actions applied in civil rights contractual dispute in absence of Federal statute of limitations for civil rights actions, 42 U.S.C. § 1981); Page v. Curtiss-Wright Corporation, 332 F.Supp. 1060 (D.N.J.1971) (*accord*).

In sum, the applicable contract limitations period being six years, M.S.A. § 541.05(1), none of the members of the class are barred here. Even if the two year period is applied under the provision regarding actions arising under statutes, M.S.A. § 541.07(5), the same result would obtain based on the statutory period not being triggered until the last day upon which vacations could have been taken by the plaintiffs. Kohout v. Shakopee Foundry Company, *supra.* Similarly, characterized as tortious, the statute of limitations would not bar anyone here since it would be a six year period, whether viewed as an injury to the "rights" of the Swift employees or as fraudulent. M.S.A. § 541.05(5), (6).

Having defined the class, the Court recognizes the imminency of devising and transmitting the notice required by Rule 23(c)(2).[6] It appears that the named plaintiffs have within their possession and control a mailing list containing names and addresses of former members of the local union, P–167 (Tauer Deposition, II, p. 6, 1–23, Nov. 2, 1972). The Court feels that production of the list for the Court's use in dealing with the notice requirement will be helpful in expeditiously proceeding with this action.

Therefore, the determination that this action may be maintained as a class action and the Court's defining of that class are conditioned on plaintiffs filing within 30 days of their receipt of this Order with the Clerk of Court a list (or lists) of the names and last known residential addresses of all members of such class, as defined above, to the best of their knowledge, information and belief. Hardy v. United States Steel Corp., 289 F.Supp. 200, 203 (N.D.Ala.1967).

This Order is without prejudice to defendants to seek relief by appropriate motion should plaintiffs fail to provide the above mentioned information. It also is without prejudice to plaintiffs subsequently to amend, by addition or deletion, the list(s) of names and addresses to be filed with the Clerk of Court, upon a showing of proper cause. Moreover, the Court reserves all its powers under Rule 23(c)(1) to alter or amend the Order, or to deny class action treatment at any time, depending upon later developments in this case. City of Philadelphia v. Emhart Corp., supra, 236; cf. Advisory Committee Note, supra, 104.

Accordingly, the Court concludes that pursuant to Rule 23(c)(1) this action may be maintained as a class action, with the class as defined above in this Order. This determination of class maintainability shall be conditioned on plaintiffs filing within 30 days with the Clerk of Court the most up-to-date list(s) within their possession and control of names and mailing addresses of members of the class. The Court reserves its powers under Rule 23 to alter, amend, or otherwise condition this Order at any future time.

---

6. Without attempting, at this stage, to dictate to the parties how the cost of notice should be borne, the Court is inclined to think that plaintiffs should bear a substantial portion, perhaps all of the expense here. The protracted proceedings in Eisen v. Carlisle & Jacquelin provide the leading authority on the matter. On remand from the Second Circuit, Judge Tyler ordered a preliminary hearing on the merits prior to determination of how to allocate the expenses of notice. 52 F.R.D. 253, 265 (S.D.N.Y.1971). After the hearing he concluded that because plaintiff appeared more likely than not to prevail at trial or on a motion for summary judgment, defendants should pay 90 per cent of the notice costs, plaintiff to pay the other 10 per cent. 54 F.R.D. 565, 573 (S.D.N.Y. 1972). This flew in the face of the Second Circuit's prior remark, on reversing and remanding the case, that "in such a case as this" the plaintiff must bear the burden of furnishing notice. 391 F.2d 555, 568 (1968). In the most recent decision on appeal, the Circuit Court repudiated this procedure, reiterating that at least "'in this type of case,'" the costs of notice must, as a matter of law, be borne by the representative party, or else the case might be subject to dismissal on grounds of unmanageability. 479 F. 2d 1005, 1009. The Court did not, however, rule out the possibility of different forms of allocation of notice costs in other kinds of, or less sprawling, class actions. Id., n. 5.

The character of the case at bar, of course, is markedly different from Eisen. It does not, therefore, necessarily follow that Eisen's reasoning is applicable here. But in view of the representative parties' familiarity with the identities and whereabouts of a large number of class members, the financial burden here probably should fall mainly, or entirely, upon them. See 3B Moore, supra, Para. 23.55. Because of the comparatively small size of the class and the relative ease with which the members apparently can be located, it would not seem very onerous to demand them to bear this burden here. Compare Dolgow v. Anderson, supra, 43 F. R.D. 462, 498–501. The cost of providing this notice will not amount to more than a few hundred dollars, a sum that can in no way be considered prohibitive in view of the total amount of damages sought by the class.