Billy G. BUTLER, Appellee,

v.

LOCAL UNION 823, INTERNATION-
AL BROTHERHOOD OF TEAM-
STERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS OF
AMERICA, Appellant,

and

Yellow Freight System, Inc., Appellant.

Nos. 74–1342, 74–1567.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 12, 1974.

Decided March 18, 1975.

Rehearings and Rehearings En Banc
Denied May 8, 1975.

John J. Kitchin, Kansas City, Mo., and Daniel J. Leary, Joplin, Mo., for appellant.

John A. Biersmith, Kansas City, Mo., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, HEANEY, Circuit Judge, and MEREDITH, Chief District Judge.*

HEANEY, Circuit Judge.

Billy G. Butler brought this action against his employer, Yellow Freight System, and against Teamsters Local 823, alleging that Yellow had breached certain terms of its collective bargaining agreement and that the Local had failed to fairly represent him in the processing of his resultant grievances. The jury returned verdicts against both defendants.[1]

Butler's former employer, Watson-Wilson Transportation Systems, merged with Yellow in 1966, at a time when Butler was on layoff status. Butler was called to work for Yellow at its terminal in Baxter Springs, Kansas, in March of 1967. Yellow granted Butler a company seniority date of May 6, 1959 (his date of hire with Watson-Wilson) for fringe benefit purposes, but granted him a terminal seniority date of March 29, 1967, for bid purposes. Butler filed a grievance on July 5, 1967, claiming that he was entitled to company seniority for bid purposes under the collective bargaining agreement.[2] The grievance was denied

---

* JAMES H. MEREDITH, Chief Judge, Eastern District of Missouri, sitting by designation.

1. The jury awarded $6,500 actual and $30,000 punitive damages against the Local, and $28,-000 actual and $7,000 punitive damages against the Employer. The District Court amended judgment after trial to provide that Butler's seniority date for all purposes was to be May 6, 1959.

2. Butler also claimed that he was entitled to certain moving expenses, a claim which was denied by the Grievance Committee, but subsequently upheld by the District Court. The appellants do not devote space in their briefs to refuting this claim, and, in its discussion of the merits, this Court will address only the seniority portion of the underlying dispute.

by the Missouri-Kansas Grievance Committee after an August 2, 1967, hearing. This lawsuit was commenced on June 8, 1972.

The appellants assert: (1) that the actions against the Employer and the Local were barred by the appropriate statutes of limitations; (2) that the court erred in its instructions as to the legal effect of the collective bargaining agreement; (3) that the instructions were improper and that there was not sufficient evidence on the issue of fair representation; (4) that the award of punitive damages was erroneous; and (5) that the scope of post-trial equitable relief was too broad. We affirm the actions of the trial court, except for its award of punitive damages.

I. THE STATUTE OF LIMITATIONS.

The trial court held that the action against each defendant was "based on a written contract," and that it was not necessary to determine whether the law of Missouri (the forum state) or the law of Kansas governed, since both states provided a five-year period for actions based on written contracts. *See* Rev. Stat.Mo. § 516.120; Kans.Stat.Ann. § 60–511. The court further held that, under the doctrine of Vaca v. Sipes, 386 U.S. 171, 186–187, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), Butler had no "fully vested" cause of action against the Employer or the Local until Butler had exhausted the grievance procedures. Since the adverse Grievance Committee decision was rendered with five years of Butler's commencement of suit, the court held that the suit was not barred. We agree that neither action was barred.

■ Because there is no federal statute of limitations governing § 301 breach of contract actions or governing fair representation actions, the timeliness of such suits is governed by the "appropriate" state statute of limitations. International Union v. Hoosier Cardinal Corp., 383 U.S. 696, 704–705, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). This search for the "appropriate" statute requires determination of several sub-issues, some of which are controlled by federal law, and others by state law.

A. THE CHARACTER OF THE CAUSE OF ACTION AGAINST THE EMPLOYER.

■ When a plaintiff sues on a federal cause of action, the character of the action—*e. g.,* whether it is one in "tort" or in "contract"—is a federal question. International Union v. Hoosier Cardinal Corp., *supra* at 706, 86 S.Ct. 1107; Abrams v. Carrier Corp., 434 F.2d 1234, 1251–1252 (2nd Cir. 1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971). The task is to select the characterization which "best effectuates the federal policy at issue." Vanderboom v. Sexton, 422 F.2d 1233, 1237 (8th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970), *quoting* Charney v. Thomas, 372 F.2d 97, 100 (6th Cir. 1967). The District Court's decision to apply the written contract statute of limitations to the action against the Employer does this. The Supreme Court in International Union v. Hoosier Cardinal Corp., *supra,* did apply an oral contract statute of limitations to a § 301 action, but it did not purport to lay down a universal rule.[3] Here, the determination of whether or not the Employer had in fact breached the collective bargaining agreement depended entirely on an interpretation of the written documents which comprised that agreement. Thus, as in Sandobal v. Armour & Co., 429 F.2d 249 (8th Cir. 1970), the action

---

3. Nor can we agree that the Supreme Court intended to lock § 301 actions into the oral contracts' limitations period when it said that "relatively rapid disposition of labor disputes is a goal of federal labor law." International Union v. Hoosier Cardinal Corp., 383 U.S. 696, 707, 86 S.Ct. 1107, 1114 (1966). The Court was there forced to choose between Indiana's five-year period for oral contracts and its twenty-year period for written contracts. Its finding that the twenty-year period was not the most appropriate one to further federal labor policy cannot be taken as a blanket rejection of the written contract characterization in other states where, as in Missouri and Kansas, the yardstick is a significantly shorter five years. Indeed, five years was viewed by the *Hoosier* Court as "relatively rapid."

against the Employer was properly characterized as one on a written contract.

## B. THE CHARACTER OF THE CAUSE OF ACTION AGAINST THE LOCAL.

The proper characterization of the fair representation action against the Local is more difficult, and is an issue which has divided the Circuits. The First and Fifth Circuits have held that a fair representation action against a union, even when coupled with a breach of contract action against an employer, is properly characterized as a tort action, notwithstanding the fact that the disparate characterizations may result in a longer period of vulnerability for the employer than for the union. *See* Sanderson v. Ford Motor Co., 483 F.2d 102, 114 (5th Cir. 1973); De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO, 425 F.2d 281, 286–287 (1st Cir.), cert. denied, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970). On the other hand, the Second Circuit has held that the actions against employer and union ought to be of the same duration, and, therefore, has applied the written contract period of limitations to a fair representation action where that action was joined with a breach of contract suit against the employer.[4] *See* Abrams v. Carrier Corp., *supra*, 434 F.2d at 1251–1253. *Accord*, Dudley v. Woods Industries, Inc., Civ.No. KC–3491 (D.Kan., March 20, 1974); Buchholtz v. Swift & Co., 62 F.R.D. 581, 602–604 (D.Minn.1973) (dictum).

We acknowledge that the arguments in *De Arroyo* favor characterizing the unfair representation action as a tort. The gist of the action is malicious, arbitrary or fraudulent conduct injuring the employee. The action exists independent of the § 301 action against the employer, and the union need not be sued in order

to sue the employer. Vaca v. Sipes, *supra*, 386 U.S. at 186–187, 87 S.Ct. 903. Moreover, there will be instances in which the action against the employer is really only incidental to the primary claim that the union has breached its duty of fair representation. In such instances, it may be "letting the tail wag the dog" to extend the union's period of vulnerability by tacking on an incidental § 301 claim against the employer.

■ Yet, despite the logic of these arguments, we conclude, as did the District Court, that the policies underlying federal labor law will be best effectuated by applying the written contract statute of limitations to the action against the Local. We reach this conclusion for the following reasons:

First, it is clear since Vaca v. Sipes that to recover against his employer, an employee will first have to establish that the union has breached its duty of fair representation. Thus, the traditional argument favoring statutes of limitations—that claims based on stale evidence ought to be barred—is simply not applicable. The "stale evidence" is necessary anyway. *See* Abrams v. Carrier Corp., *supra*, 434 F.2d at 1252; Buchholtz v. Swift & Co., *supra*, 62 F.R.D. at 603.

Second, the damages assessed against the union are inextricably tied to the breach of contract. If a court determines that the employer has not breached the contract, even if the union has breached its independent duty of fair representation, the employee will not be entitled to collect from the union damages flowing from the alleged contract breach. *See* Vaca v. Sipes, *supra*, 386 U.S. at 198, 87 S.Ct. 903.

Third, only by providing the same limitations period against both employer and union, will the court be able to fashion a remedy which properly allocates

---

**4.** The Sixth Circuit has held, without discussion, that a fair representation action is properly characterized as one to enforce a liability "created by statute." Gray v. International Association of Heat and Frost Insulators and Asbestos Workers, Local No. 51, 416 F.2d 313, 316 (6th Cir. 1969). We reject that characterization here for the same policy reasons for which we reject the tort characterization.

the damages between them.[5] In instances where the employer has acted entirely in good faith in its interpretation of the contract, it will be protected if the union has fairly represented the employee, but it will be vulnerable if the union has acted unfairly. Because the good faith employer's liability is dependent on the union's conduct, there is an inherent unfairness in a rule which would allow the union to raise a limitations defense while denying such a defense to the employer. The Supreme Court in *Vaca* recognized the importance of having both defendants before the court:

> \* \* \* [I]t is obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions. If a breach of duty by the union and a breach of contract by the employer are proven, the court must fashion an appropriate remedy. Presumably, in at least some cases, the union's breach of duty will have enhanced or contributed to the employee's injury. What possible sense could there be in a rule which would permit a court that has litigated the fault of employer and union to fashion a remedy only with respect to the employer? \* \* \*

*Id.* at 187, 87 S.Ct. at 915.

The Court continued:

> The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages

caused by the union's refusal to process the grievance should not be charged to the employer. \* \* \*

*Id.* at 197–198, 87 S.Ct. at 921.

The goal of fairly apportioning damages will best be met by a rule which subjects both defendants to an equal period of vulnerability to suit.

Finally, the retention of congruent jurisdiction over the unions will encourage them to represent employees fairly and completely in arbitration proceedings.

■ We, therefore, hold, as did the Second Circuit, that

> \* \* \* when a § 301 suit is brought against an employer alleging breach of the collective bargaining agreement in conjunction with a claim that the union breached its fair representation duty to pursue the employee's grievance, the same period of limitations should be applied to both claims. \* \*

*Abrams v. Carrier Corp., supra,* 434 F.2d at 1252.

We stress, as did that court, that this rule does not have application to all fair representation suits and that, in other contexts, the tort characterization, the "statutory duty" characterization, or some other characterization might be more appropriate. *Id.* at 1252 n.15. Since both Missouri and Kansas statutes provide that written contract actions must be brought within five years, we need not determine which of the two states' statutes is the governing one.[6]

## C. ACCRUAL OF THE CAUSE OF ACTION AGAINST THE EMPLOYER.

■ The question of when a federal cause of action "accrues" and the related

---

5. Indeed, if the "tail has wagged the dog," the apportionment of damages between union and employer ought to reflect that fact, thus diminishing the *De Arroyo* court's objection to the longer statute of limitations. *See* Vaca v. Sipes, 386 U.S. 171, 198, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

6. Unlike the question of characterization, the question of which law governs as between two states is purely state question. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). We note

that if we were to characterize the action against the Local as one in tort or to enforce a statutorily created liability—actions for which Missouri and Kansas statutes of limitations differ in length—we would confront problems of interpretation under the Missouri "borrowing statute." Rev.Stat.Mo. § 516.190. For cases involving federal causes of action which have grappled with such statutes, see Cope v. Anderson, 331 U.S. 461, 466, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); Sack v. Low, 478 F.2d 360 (2nd Cir. 1973).

question of whether it is "tolled" by subsequent events, are federal questions. *See* Cope v. Anderson, 331 U.S. 461, 464, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); Donaldson v. O'Connor, 493 F.2d 507, 529 (5th Cir.), cert. granted, 419 U.S. 894, 95 S.Ct. 171, 42 L.Ed.2d 138 (1974); Antonioli v. Lehigh Coal & Navigation Co., 451 F.2d 1171, 1175 (3rd Cir. 1971); Vanderboom v. Sexton, *supra*, 422 F.2d at 1240.

█ The action against the Local obviously could not have accrued until the Local engaged in the acts of unfair representation in the grievance process. The date of accrual in this case is August 2, 1967, the date when the grievance was rejected. Therefore, the action against the Local is not barred by the five-year statute of limitations which we have held applicable.

The action against the Employer presents more difficulty, however, for the initial breach of the contract occurred on March 29, 1967, more than five years before suit was filed. There are three ways to approach accrual of the cause of action against the Employer:

First, it could be said that the cause of action accrued when the contract was breached on March 29, 1967, and that the statute of limitations was not tolled by any subsequent events.[7]

Second, it could be said that the cause of action accrued when the employer breached the contract on March 29, 1967, but that the running of the statute was suspended during and only during the period between the filing of the grievance on July 5, 1967, and the rejection of the grievance on August 2, 1967.[8]

█ Third, it could be said that the cause of action did not accrue until the grievance was rejected on August 2, 1967, since only then had the necessary condition precedent to suit—rejection of the grievance due to unfair representation—taken place.[9] This was the approach taken by the District Court.[10]

█ We have concluded that the District Court adopted the proper approach in holding that Butler's cause of action against the Employer did not accrue until his grievance was rejected and

---

**7.** In urging this approach, the Employer cites McMahon v. United States, 342 U.S. 25, 72 S.Ct. 17, 96 L.Ed. 26 (1951). There, the Supreme Court held that, under the Suits in Admiralty Act, a sailor's cause of action for damages arose when he was injured—not at a later date when his administrative claim was rejected. Hence, the statute of limitations ran from the date of injury. However, that Act itself provided a federal statute of limitations, unlike § 301.

The Supreme Court in *McMahon* stressed two important features of the Act's scheme: (1) the sailor was not required to file his administrative claim within any set time, and, therefore, a contrary rule would permit him to extend the statute of limitations intolerably merely by delaying filing of his claim; and (2) the Act provided that if his claim was not ruled on within sixty days, it was to be deemed rejected and, therefore, the government agency would not be able to consume the limitations period by its own delay.

**8.** The Third Circuit adopted this approach in a novel decision under the Suits in Admiralty Act. Northern Metal Co. v. United States, 350 F.2d 833, 838–839 (3rd Cir. 1965). It declared that this holding was consistent with the Supreme Court ruling in McMahon v. United States, *supra* note 7, that the cause of action

accrued at the time of injury. The virtue of this approach is that a plaintiff cannot extend the statutory period by means of his own delays, but the delays of the administrative body will toll the running of the statute.

The District of Columbia Circuit has also used this approach in a § 1981 case where a complaint had been filed with the EEOC. Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 994 n. 30 (1973).

**9.** The Supreme Court has utilized this technique in a government contract suit. Crown Coat Front Co. v. United States, 386 U.S. 503, 518–522, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967). It stressed that the facts were distinguishable from McMahon v. United States, *supra* note 7, because there was a time limit within which the claimant was required to file an administrative claim, and there was no time limit within which the administrative body was required to act.

**10.** Another way of construing the District Court's action is to say that it tolled the running of the statute until grievance procedures were exhausted. Federal courts clearly have the power to toll statutes of limitations. American Pipe & Construction Co. v. Utah, 414 U.S. 538, 559, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).

the necessary condition precedent to suit had been met.[11] Our reasons for reaching this conclusion are threefold:

First, the rule that the cause of action against the Employer accrues at the same time as does the cause of action against the Local preserves the symmetry seen necessary to the furtherance of federal labor policy in part I–B of this opinion. If either of the other two approaches to accrual were adopted, the employee's action against the union would persist after the action against the employer had expired. It would be irrational to adopt a rule which would leave the union as the only defendant after first applying a longer statute of limitations to the union's conduct for the very purpose of assuring that both defendants are equally vulnerable.

Second, the underlying policies of federal labor law will not be furthered by enmeshing § 301 breach of contract actions in technicalities that operate to the disadvantage of plaintiffs who have acted entirely in good faith in following the contract's command that they first submit their grievance to the arbitration process. As in Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 994 n. 30 (1973), we are not dealing with a clear expression of congressional intent as to limitations, since Congress has not enacted any statute of limitations applicable to § 301 actions. Instead, we are forced to create limitations as a matter of judicial implication, and we must be guided in that process by the policies and goals of federal labor law.

 Third, common sense indicates that there is no accrual until all facts

exist so that the plaintiff can allege a complete cause of action. Those facts did not exist here until · the union had acted unfairly in the processing of the grievance. The Employer calls our attention to cases involving "notice statutes"—for example, providing that a municipality may not be sued until it is served with notice—and relies on holdings in those cases to the effect that the cause of action accrues when the damage occurs, and not when notice is finally given. See, e. g., Welch v. Kansas City, 204 Kan. 765, 465 P.2d 951 (1970). Those cases are inapposite, however, for the only act necessary to perfect the plaintiff's cause of action in such cases is an act which is to be entirely performed by the plaintiff; thus, it is felt that he must not be allowed to indefinitely suspend the running of the statute by delaying performance of the act. Here, not only is the condition precedent to suit a matter which is entirely beyond the plaintiff's control, but furthermore, the plaintiff should obviously not be required to anticipate that the union will act unfairly in representing him. On the contrary, the employee has every right to expect that the union will fulfill its duty properly, and that there will be no occasion for a § 301 suit.[12] Cf., Gainey v. Brotherhood of Railway and Steamship Clerks, 275 F.Supp. 292, 307 (E.D. Pa.1967), aff'd, 406 F.2d 744 (3rd Cir. 1968), cert. denied, 394 U.S. 998, 89 S.Ct. 1590, 22 L.Ed.2d 775 (1969).

We, therefore, conclude that the District Court was correct in holding that neither the action against the Employer nor the action against the Local was barred by the appropriate statute of limitations.

11. The cause of action accrued when the employee had exhausted those steps in the grievance procedure which he had power to invoke, for Vaca v. Sipes, supra, 386 U.S. at 185, 87 S.Ct. 903, requires only exhaustion of such steps. See also Dill v. Greyhound Corp., 435 F.2d 231, 237 (6th Cir. 1970), cert. denied, 402 U.S. 952, 91 S.Ct. 1622, 29 L.Ed.2d 122 (1971).

12. The one remaining residue of McMahon v. United States, supra note 7, is that there apparently is no provision in the collective bargaining agreement requiring the employee to submit a grievance within any time limit. Thus, there is a possibility that an employee will be able to extend the time limits of the statute by delaying his filing of a grievance. This power of the employee does not present a serious problem, however, for the union and the employer may agree by contract to a reasonable fixed time limit within which grievances must be filed.

## II. THE INSTRUCTIONS ON THE LEGAL EFFECT OF THE CONTRACT.

The collective bargaining agreement in effect during the merger process in 1965 and 1966 provided in Article V § 3(a) that, in the event of merger, the seniority of affected employees was to be determined by "mutual agreement" between the employers and the union, in accordance with the following general rules:

§ 3(a)(1) If both carriers involved are solvent then the seniority lists of the two Companies should be dovetailed so as to create a Master Seniority List based upon total years of service with either Company. This is known as dovetailing in accordance with years of seniority. * * *

* * * * * *

§ 3(a)(8) The parties acknowledge that specific situations may arise which may not be covered by the above rules, or in which the parties may feel that different treatment of the problem is necessary. * * * The Change of Operations Committee * * * shall have the authority to add to or modify these rules in specific situations presented to it.

■ When the Change of Operations Committee was first presented the facts regarding the proposed merger, it issued a written ruling on June 16, 1965, consistent with the contract:

* * * All displaced employees * * * shall be placed on the Master Seniority [List] with the original date of hire, regardless of the terminals they may have worked in where they had accumulated only terminal seniority * * *.

By September of 1966, approximately seventeen former Watson-Wilson employees, not including Butler,[13] were working at the Baxter Springs terminal of Yellow, but their names had not yet been dovetailed with those of the Yellow drivers at that terminal.[14]

On September 20, 1966, another Change of Operations Committee meeting was held in Chicago. No minutes of that meeting were produced and, unlike the June 16, 1965, meeting, it did not result in the issuance of a written decision. The evidence as to what took place at that meeting was slight, and dealt only with its purported outcome. Mr. Melton, then a Vice President for Watson-Wilson, testified that

* * * the decision was that all those employees presently working at St. Louis, Chicago, and Baxter Springs would be dovetailed in line with their full company seniority and any employees accepting job opportunity after that date would go to the bottom of the list for terminal seniority and [would have] company seniority for his [sic] fringe benefits.

The Local had apparently not reached the same conclusion as to the outcome of that meeting, for on September 26, 1966, Local representative Kitts posted a roster in which only the first nine of the seventeen former Watson-Wilson drivers already working at Baxter Springs were dovetailed with the Yellow drivers. The remaining eight were given terminal seniority for bid purposes. Several of the latter employees filed grievances, and the union and Employer subsequently agreed to grant them company

---

**13.** It is not contended that Butler was entitled to recall to the Baxter Springs terminal at that time.

**14.** The defendants urged that separate seniority lists were required by the contract because the companies were operating under nonparallel rights and the ICC had not yet finally approved the merger. They contend that the instructions erroneously fixed the date of final ICC approval and hence erroneously fixed the date on which dovetailing was required. The court disagreed, ruling that dovetailing was required under the contract long before the ICC finally approved the merger on October 10, 1968. We do not believe that the issue of *when* the rosters were to be consolidated is relevant to the issue of *which* employees were to be granted company seniority. Hence, any mistake as to the date of final ICC approval is not relevant.

seniority.[15] The result was a roster on December 16, 1966, which dovetailed all the former Watson-Wilson employees *then* working for Yellow at Baxter Springs with the Yellow drivers.

The court instructed the jury in effect that, when recalled to work at Baxter Springs on March 29, 1967, Butler was entitled to be granted his company seniority by the provisions of the collective bargaining agreement and the relevant Change of Operations decision, and that Yellow breached the contract if it did not afford him such seniority. The appellants object to this instruction, claiming that it removed the only significant issue from the jury—whether it made any difference that Butler came to Baxter Springs after the purported September 1966 cutoff date.

■ We find no error in the court's legal conclusion that the contract was unambiguous. Article V § 3(a)(1) directly covers the situation which arose when Butler was called to work. Yellow claims that Article V § 6 authorizes less than full seniority, but that provision deals only with instances where a branch or terminal of the company is closed, and was plainly not applicable to the merger here. Since the contract was not ambiguous,[16] it was proper for the court to instruct the jury as to its meaning and effect. *See Motor Carriers Council of St. Louis, Inc. v. Local Union No. 600,* 486 F.2d 650, 653 (8th Cir. 1973).

■ Yellow claims, however, that the September 20, 1966, "decision" of the Change of Operations Committee altered the terms of the contract, and that the instructions were defective in failing to even mention this decision. We do not agree. The trial court's reasoning in removing the issue of contract-alteration from the jury is not expressed on the record. It seems clear, however, that the purported contract alteration was ignored for one of two reasons: (1) there was not sufficient evidence to permit a finding that the contract had indeed been altered; or (2) there was not sufficient evidence to permit a finding that the Committee had complied with the conditions of § 3(a)(8) in modifying the contract.[17] We conclude that failure to instruct on the September 20 decision was proper under either theory.

■ First, the defendants' proof of the decision was entirely dependent on the oral testimony of two witnesses—Mr. Kitts and Mr. Melton. Within days of the purported decision, Mr. Kitts took part in the posting of a roster which was inconsistent with the defendants' version of what that decision had held. We need not determine the degree of formality which is necessary for the Committee to modify the contract, but surely a written record of some type is necessary—whether a formal written decision, as employed in June of 1965, an exchange of correspondence, or the minutes of the meeting. Only when the decision is reduced to some permanent form will affected persons be adequately informed of the modification. Assuming that the

---

**15.** The record is murky as to how this change came about. Local representative Kitts testified that Mr. Roy Williams, Chairman of the union bloc on the Grievance Committee, informed him that he had been mistaken in his interpretation of the Committee's September 20 decision, and that all currently working employees were to be dovetailed. Mr. Smith, who was one of the former Watson-Wilson employees originally denied company seniority by the September 26 roster who filed a grievance, testified that

 * * * Brother Williams got up and said it was sort of fouled up and they would have to go back to Chicago to the original Change of Operations Committee, at least that's what I understood him to say.

**16.** For the same reason, there was no abuse of discretion in the court's exclusion of oral testimony offered to show industry practices in other mergers and offered to explain other Change of Operations Committee decisions which were allegedly analogous.

**17.** While we are not faced with the issue, it seems clear that there is a third theory protecting employees in the contract-modification process. For, even without the conditional language of § 3(a)(8), under the fair representation doctrine it seems clear that the Committee could not modify the contract in an irrational way in order to discriminate against an employee or group of employees.

District Court was relying on this approach, we agree that the testimony of Kitts and Melton was insufficient, as a matter of law, to support a finding that the contract had been modified.

Second, we read § 3(a)(8) to limit the Committee's power to those specific situations which are not covered by the rules, or in which "the parties may feel that different treatment of the problem is necessary." Since the rules clearly covered Butler's recall, the power to alter the contract could only be triggered by the latter condition; the cutoff line between employees recalled by September 1966 and employees recalled thereafter had to be rooted in necessity. The defendants made no showing that it was necessary to treat Butler in a different manner than his predecessors; indeed, they did not even attempt to demonstrate that the Committee *felt* that different treatment was necessary. Not only was there no showing of necessity, but the record is devoid of any rational explanation for the cutoff imposed here and counsel for the appellants was unable to advance any explanation at oral argument. Under these circumstances, the District Court would have been correct in holding that the September 20, 1966, action of the Committee was not in accordance with the contract. Hence, the explicit provisions of Article V § 3(a)(1), as implemented by the earlier Change of Operations decision, were controlling. The instructions adequately apprised the jury of the meaning of the contract.

### III. PROPRIETY OF THE INSTRUCTIONS AND SUFFICIENCY OF THE EVIDENCE ON THE ISSUE OF FAIR REPRESENTATION.

The appellants assert that the court's instructions on the issue of unfair representation were inadequate. We have examined them carefully and find that there was no error. The court instructed the jury that the Local had "a legal duty fairly to represent the plaintiff without arbitrariness, discrimination, or bad faith * * * in the processing of his complaint and grievance," and

that the jury could not find the Local liable unless it found that the Local had breached that duty. In giving these instructions, the court employed the language of the Supreme Court in Vaca v. Sipes, *supra,* 386 U.S. at 190, 87 S.Ct. 903. We cannot agree with the appellants that, in the circumstances of this case, further definitions of "arbitrary," "discriminatory," or "bad faith" were required. Furthermore, the court correctly stressed to the jury that it could not find Yellow liable unless it first found that the Local had failed to represent the plaintiff fairly.

The evidence viewed most favorably to the jury verdict on the issue of fair representation supports it. Kitts testified to an atmosphere of antagonism among Yellow drivers after the first Change of Operations Committee decision in 1965:

* * * I had quite a lot of trouble with the Yellow Freight drivers * * *. Everybody knew that Watson drivers had a lot of seniority, Watson was an old line * * * and they didn't want any of them down there. * * * [T]hey felt that they had no reason to be there * * *. And there was a lot of dissatisfaction amongst the drivers, and well, it got pretty bad. They was about ready to throw me out of the hall, and the president of our local, too, because they absolutely didn't want to lose any of their work. * * *

The jury could logically infer that this hostility against Watson-Wilson employees was given an outlet in the Local's aborted attempt in the September 26, 1966, roster, to cut off eight of those former employees who were already working at the Baxter Springs terminal. Butler testified that Local President Webb "guaranteed" that his grievance would be rejected, and told him flatly that he could not attend the Grievance Committee hearing. There was adequate evidence from which the jury could find that the Local was continuing to protect Yellow drivers—this time at the expense of Butler—and that the Change of Operations Committee al-

leged decision of September 1966 was an irrational and discriminatory one which the Local failed to contest on Butler's behalf because it did not wish to antagonize Yellow drivers.[18] In short, the jury could find that the Local had breached its duty to insist that the Employer adhere to the contract, and had acquiesced in an irrational interpretation of the contract, thereby discriminating against Butler.

We stress, however, that we do not hold here that the mere fact that a District Court ultimately disagrees with a union's interpretation of a collective bargaining agreement is sufficient in and of itself to establish a case of unfair representation.

## IV. THE AWARD OF PUNITIVE DAMAGES.

Assuming arguendo that there will be instances in which punitive damages are proper in a § 301 or unfair representation action,[19] we conclude that the record does not support an award of punitive damages against either defendant.

■■■ The conspiracy count against the Employer and the Local was voluntarily dismissed by Butler, and there was no evidence that the Employer did anything more than go along with the Local's desires. Under such circumstances, it was not proper for the District Court to allow an award of punitive damages against Yellow.

■■■ The Local's conduct was not the type of outrageous or extraordinary conduct for which extraordinary remedies are needed; rather, it amounted to the commonly encountered policy of favoring one group of members over another, which lies in the mainstream of unfair representation litigation. Butler was not subjected to threats of violence, harassment, physical abuse, or the scorn and ridicule of his co-workers, and there was no showing that the Local acted with any malice directed specifically at him. *Compare* Richardson v. Communications Workers of America, 443 F.2d 974, 983 n. 12 (8th Cir. 1971). The federal courts should fashion remedies under the labor statutes which are necessary to achieving the goal of industrial peace. Textile Workers of America v. Lincoln Mills, 353 U.S. 448, 454–455, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The plaintiff did not establish that punitive damages were needed to deter future misconduct[20] or to prevent industrial strife.

## V. THE SCOPE OF EQUITABLE RELIEF.

■■■ The appellants complain of two aspects of the court's equitable relief. First, the appellants urge that it was improper for the court to invite the plaintiff, at the close of all the evidence, to amend the complaint to seek an order fixing his seniority date. We see nothing improper in the trial court's conduct. To the contrary, it is within the spirit of Federal Rule of Civil Procedure 54(c):

> * * * [E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.

*See* Stewart v. Banks, 397 F.2d 798, 799 (5th Cir.), cert. denied, 393 U.S. 801, 89

---

**18.** To be sure, Kitts testified that he presented the grievance to the Committee and asked that it be accepted, and Melton testified to the same effect. Whether Kitts made a "strong and complete" presentation at the hearing as the appellants suggest in their brief was a factual issue resolved against them by the jury. The jury may have discounted the testimony of Kitts and Melton due to their demeanor, the Local's past favoritism to Yellow drivers, and Butler's testimony.

**19.** On this issue, *see* Williams v. Pacific Maritime Association, 421 F.2d 1287, 1289 (9th Cir.

1970); Local 127, United Shoe Workers v. Brooks Shoe Mfg. Co., 298 F.2d 277 (3rd Cir. 1962). *Cf.* Richardson v. Communications Workers of America, 443 F.2d 974 (8th Cir. 1971) (reversing District Court's dismissal of an employee's claim for damages for mental distress).

**20.** If the Local had persisted in its post-trial policy of encouraging grievances in opposition to Butler, see p. 455, *infra*, we would be faced with a different situation.

S.Ct. 41, 21 L.Ed.2d 85 (1968). It was within the court's discretion to decide that equitable relief was more appropriate than an award of damages requiring speculation about future lost earnings. *See* De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO, *supra*, 425 F.2d at 290–292. We cannot agree with the appellants that the court, in awarding such relief, failed to adequately consider the interests of absentees, for those interests had been consistently advanced by the Local throughout the trial.

 Second, the appellants complain of an injunction entered several months after judgment and permanently restraining them from

> * * * interfering with or in any manner disturbing plaintiff's seniority status, including the processing or advocating of all grievances that are in opposition to the plaintiff's said seniority status * * * .

The appellants urge that the court lacked power to issue this order without first joining as indispensible parties those Yellow drivers whose seniority status was adversely affected by the earlier order fixing Butler's seniority date. They contend that presence of the non-party employees was indispensible because the order has the effect of permanently fixing their seniority and strips them of their collective bargaining rights to present grievances, all without notice, hearing or participation.

The factual background of this post-trial order was as follows: Subsequent to the court's judgment fixing Butler's seniority date, the Local posted a notice over the signature of Kitts suggesting [21] that the Yellow drivers adversely affected by Butler's new seniority status file grievances.[22] As a result, fourteen drivers filed identical grievances, the disposition of which, Kitts informed Butler by letter, "may affect your seniority." The court's order had the direct result of precluding a hearing on those grievances.

We find no error in the court's post-trial order. From the record, it seems clear that all fourteen of the grievances enjoined by the order complained solely of seniority loss occasioned by the grant to Butler of the May 6, 1959, seniority date,[23] and sought solely to take away that grant as a discriminatory one. We construe the injunction to prohibit only the processing of such direct attacks on the District Court judgment. We see nothing in the order which would prohibit the Local from processing seniority grievances based entirely on issues which were not litigated and settled by the court. It was the court's purpose to assure that Butler's seniority date would remain fixed at May 6, 1959, and it was precisely that date which the fourteen grievances sought to upset. In forbidding the processing of such grievances, the order simply recognized the rule of res judicata.

 The appellants' contention that the adversely affected employees were not represented in the District Court action is without merit. It was the task of

---

21. At oral argument, counsel for the Local conceded that this verb fairly characterizes the Kitts notice.

22. The notice read:

> Attention All Road Drivers
> Baxter Springs Terminal

> On July 11, 1973, in the federal district court William Becker Chief Judge took the position that Billy G. Butler's seniority date is May 6, 1959 and that such seniority date is to be dovetailed with the seniority dates of all the other over the road truck driver employees of Yellow at its Baxter Springs, Kansas terminal.

> Local Union 823 has filed post trial motions asking the court to set aside this seniority date.

> Any road driver affected by this May 6, 1959 seniority date of Billy G. Butler has a right under Article 45 of the Central States Area Over the Road Supplemental Agreement to file a grievance with Local 823 which will be handled under this particular article.

23. A letter from Kitts to the fourteen grievants, attached to the plaintiff's petition seeking the post-trial order, declares:

> * * * All the grievances involve claims of discrimination because of the grant by Yellow Freight Systems, Inc., to Mr. Billy G. Butler of a seniority date of May 6, 1959.

the Local to represent their interests, and the record indicates that it has done so vigorously, even to the point of prosecuting this appeal. It is not for the Local to decide in post-trial grievance proceedings that its own actions have been unfair to the other Yellow drivers, thus giving it the right to defy the court order. Merely to state the theory is to expose it as frivolous.[24]

Accordingly, the cause is remanded to the District Court for the purpose of amending the judgment to delete any reference to punitive damages, and in all other respects the actions of the District Court are affirmed.

---

24. The two cases cited by the appellants in support of their argument that the absent employees were indispensible parties are inapposite. In Bremer v. St. Louis Southwestern R.R. Co., 310 F.Supp. 1333, 1339–1340 (D.Mo. 1969), the District Court merely required that an employee who was suing her employer on a sex discrimination charge join the union and the one employee holding the disputed position as parties defendant. In Nix v. Spector Freight System, Inc., 264 F.2d 875, 877 (3rd Cir. 1959), the court similarly held that a group of employees suing their employer to gain greater seniority had to join as defendants *either* the union *or* the other group of employees. Obviously, in neither of those suits were the adversely affected parties represented at all prior to the joinder. Here, on the contrary, the Local was named as a defendant—thus complying with the *Nix* decison—and it consistently championed the rights of the other employees.